**Michael A. RUSSO, T/A Nor-Bridge Service Center, Inc. and Robert A. Loringer, T/A Bob's Getty Service Station, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**TEXACO, INC., a Delaware corporation, and Power Test Corporation, a Delaware corporation, Defendants.**

No. 85–CV–1246(JBW).

United States District Court, E.D. New York.

Feb. 21, 1986.

MEMORANDUM and ORDER

WEINSTEIN, Chief Judge.

Two service station operators bring this action on their own behalf and as a proposed class action on behalf of others. They seek damages and other relief under section 4 of the Clayton Act and the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 15, 2801 *et seq.* The dispute arises out of Texaco's 1984 acquisition of the Getty Oil Company and its divestiture of franchise relationships with Getty service station dealers in the Northeast and Mid-Atlantic regions by transfers to Power Test Corporations. Texaco and Power Test move for summary judgment on the PMPA claims.

For reasons indicated below partial summary judgment must be granted. Rule 56(e), Federal Rules of Civil Procedure. Further discovery is unlikely to reveal any relevant information. Almost all the critical information is in Federal Trade Commission files, the Federal Register and court files subject to judicial notice. Rule 201, Federal Rules of Evidence; 44 U.S.C. § 1507.

### FACTS

In January 1984, Texaco, through a series of agreements, sought to acquire the shares and assets of Getty which included, among other things, virtually all of the Getty gasoline station assets in the Northeast and Mid-Atlantic regions of the United States. Because of the size of the transaction—approximately $10.1 billion—FTC review was required under the Hart-Scott-Rodino Anti-Trust Improvements Act. 15 U.S.C. § 18a.

The FTC's investigation of the acquisition identified certain potential antitrust problems that the merger of the two companies might create. For example, the FTC focused on the overlap in gasoline marketing assets of the two companies in the Northeast and Mid-Atlantic areas of the United States. Texaco and Getty had many retail outlets in this area and some of them served the same potential customers.

Arnold P. Azarow, Westbury, N.Y., Kohn, Milstein, Cohen & Hausfeld by Jerry S. Cohen, Patricia F. Bak, Washington, D.C., Zarwin, Baum, Resnick & Cohen by Norman Zarwin, Philadelphia, Pa., for plaintiffs.

Kaye, Scholer, Fierman, Hays & Handler by Milton J. Schubin, Randolph S. Sherman, Claire Shows Hancock, New York City, for defendant Texaco, Inc.

Texaco, Inc. by David A. Luttinger, John F. Carberry, White Plains, N.Y.

Dewey, Ballantine, Bushby, Palmer & Wood by John F. Collins, Saul P. Morgenstern, New York City, Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein by Michael B. Himmel, Woodbridge, N.J., for defendant Power Test Corp.

The FTC advised Texaco that, in its judgment, the proposed acquisition of Getty assets would, among other things, increase the "levels of concentration" in the "wholesale distribution of gasoline and middle distillates" in the relevant market.

The parties to the merger and the FTC proposed that the merger be approved if Texaco agreed to take specific remedial actions to address these areas of concern. Plaintiffs contend that the divestiture suggestions come from Texaco rather than from the FTC. As indicated below, nothing turns on who suggested divestiture as a remedy for approval. What is critical is that the FTC approved the deal with divestiture as a condition.

With regard to Getty's Northeast and Mid-Atlantic marketing assets (including those which are the subject of this lawsuit), the FTC required absolute divestiture as a condition of the merger's approval. The FTC's concerns and the proposed remedy were embodied in a draft complaint and a proposed consent agreement, published in the Federal Register in early March 1984. Texaco Inc. and Getty Oil, Proposed Consent Agreement With Analysis to Aid Public Comment, 49 Fed.Reg. 8550–8564 (March 7, 1984). In addition, the Federal Register included the FTC's analysis of the proposed order to aid the public in making comments, as well as Texaco's undertaking to "hold separate" the Getty assets, *i.e.*, to preserve the status quo, pending entry of the final order.

One of the principal concerns addressed by the FTC, and a stated purpose of the proposed consent order, was that the assets required to be divested by Texaco continue to be used as part of an "ongoing, viable enterprise." The FTC had identified as a potential antitrust problem the concentration of the ownership of wholesale gasoline terminals in six specific Northeast and Mid-Atlantic markets (49 Fed.Reg. at 8555), hence, the Commission's proposed order required Texaco to divest Getty's wholesale gasoline terminals in these areas.

To ensure the continued viability of these terminals as part of an "ongoing, viable enterprise," the FTC added the requirement that the Getty retail stations served by the terminals also be divested:

> The retail stations are included in the ... divestiture package solely to assure the continued viability of Getty's Northeast wholesale operations after divestiture.

FTC Analysis, 49 Fed.Reg. at 8559. As Timothy J. Muris, Director of the FTC's Bureau of Competition, testified before the House of Representatives Small Business Committee on April 11, 1984:

> To assure that Texaco could make an adequate divestiture of the wholesale terminals, the order also requires Texaco to divest some 1900 retail gasoline stations that the wholesale terminals supply. Once again, the Commission must approve in advance the buyers of these properties.

Future of Independent Marketers in the Post-Merger Petroleum Marketplace: Joint Hearing before the Subcommittee on Energy and Subcommittee on General Oversight of the House Committee on Small Business, 98th Cong., 2d Sess. 77, 81 (1984).

On January 27, 1984, Texaco—anticipating that it would be necessary to divest certain assets in order to pass FTC scrutiny—entered into a Memorandum of Agreement with Power Test. Texaco agreed to sell to Power Test virtually all of the Getty gasoline station assets, supply contracts and franchise agreements in the Northeastern and Mid-Atlantic regions for $90 million. Notwithstanding this agreement, the FTC insisted that Commission approval of that divestiture be obtained, and that it would not decide whether to approve until the Power Test divestiture was scrutinized on the merits:

> The proposed consent requires prior Commission approval of any acquirer, including Power Test. The Commission has not granted any such approval. If the proposed order is accepted finally, the Commission will decide whether to approve proposed acquirer(s) following a review of written comments submitted

by interested persons during [a] separate, 30-day public comment period....

FTC Analysis, 49 Fed.Reg. at 8559.

The FTC "duly considered" public comments on the proposed order and, on July 9, 1984, a final consent order was executed. Texaco Inc. and Getty Oil Company, Prohibited Trade Practices and Affirmative Corrective Actions ("Order"), 49 Fed.Reg. 30059–65 (July 26, 1984). That order "comprehensively regulate[d] the merger between Texaco and Getty on a nationwide basis." *Van de Kamp v. Texaco, Inc.*, 3 Civ. 24506, slip op. at 8, (Cal.Ct.App., Nov. 8, 1985).

With particular reference to the subject of this sale, the FTC Order required that:

> Within 12 months of the date of service of this Order, Texaco shall divest, absolutely and in good faith, the Schedule A Properties.

Order, II(A), 49 Fed.Reg. at 30060. Schedule A included the Getty retail gasoline properties that are the subject of this lawsuit and the Getty tradename and trademark:

> Getty's petroleum-related assets, including the 'Getty' brand name, 'Getty' trademark, and product inventories located in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, and the District of Columbia, other than the Getty refinery located in Delaware and the Getty inventories, crude handling facility, product pipeline and terminal connected to the refinery, and 30 of the properties listed in Schedule C.

Order, Schedule A(1), 49 Fed.Reg. at 30062.

Not only was "absolute" divestiture of these properties mandated, but the FTC required that both the manner of the divestiture and the acquirer receive prior Commission approval to ensure that the divested assets continued as part of an "ongoing, viable enterprise" and that the Commission's perceived antitrust concerns were remedied:

> Divestiture of the Schedule A properties shall be made only to an acquirer or acquirers, and only in a manner, that receive the prior approval of the Federal Trade Commission. The purpose of the divestiture of the Schedule A properties is to ensure the continuation of the assets as an ongoing, viable enterprise, engaged in the same business in which the properties are presently employed and to remedy the lessening of competition resulting from the [Texaco] Acquisition [of Getty]....

Order, II(B), 49 Fed.Reg. at 30060.

Until a suitable purchaser was approved, Texaco was prohibited from impairing any of the assets to be divested and was required, as already noted, to hold them "separate and apart." Order, II(E) and II(F), 49 Fed.Reg. at 30061. The order also required Texaco to submit "a full description of contracts or negotiations for divestiture" as well as "all written communications to and from [potential acquirers], and all internal memoranda, reports, and recommendations concerning divestiture." Order, III, 49 Fed.Reg. at 30061.

The FTC's review of the divestiture to Power Test is a matter of public record. Briefly, the proposed divestiture was submitted for 30 days of public comments. FTC News, July 25, 1984. Many comments were submitted by Getty dealers, distributors, or those representing Getty dealers and distributors, including a comment from plaintiff Russo. Generally these comments (1) argued that the sale to Power Test would result in the franchisees' loss of their future protection under the PMPA because Power Test was not a refiner and thus not a franchisor and (2) asked the FTC to provide that the dealers be given a right of first refusal to purchase their stations before they were sold to Power Test.

Displaying concern for the franchisees' rights under the PMPA, the FTC requested additional information from Texaco and Power Test on the subject. Power Test responded that it would undertake contractually all of the duties imposed by the PMPA:

Power Test has publicly stated its intention to respect franchisees' existing PMPA rights and has contracted with Texaco to do so. The transfer of the ownership of the 'Getty' trademark and brand name to Power Test, a non-refiner, will constitute the occurence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise will be reasonable. However, the occurrence of this event will not, as a practical matter, reduce the franchise protections afforded the Getty franchisees because Power Test will obligate itself contractually to afford the franchisees the same protection and rights currently provided them by statute.

Power Test's Response to Request No. 21 of the FTC's July 27, 1984 letter.

After considering the public comments—including those on behalf of or by plaintiffs in this action—and the additional information provided by Texaco and Power Test, the FTC staff recommended approval of the divestiture to Power Test. The Commission formally approved the divestiture to Power Test on January 17, 1985:

The Commission has considered the divestiture application, the information submitted by Texaco and Power Test, the public comments received, and other relevant information, and has determined to approve the proposed divestiture.

As soon as practicable after learning that the FTC had approved the divestiture to Power Test, Texaco notified each of the Getty dealers whose station properties were being divested to Power Test that their franchise relationship would be terminated effective July 11, 1985. That notice stated the reasons for this action as follows:

The reasons for the termination of such franchise relationship are based upon an order of the Federal Trade Commission. As you know, on February 17, 1984, Texaco Inc. acquired Getty Oil Company. In connection with that acquisition, the Federal Trade Commission ordered Texaco Inc. to "divest, absolutely and in good faith ... (numerous distributor contracts, service station properties and) the 'Getty' brand name (and) 'Getty' trademark to an acquirer ... that receive(s) prior approval of the Federal Trade Commission.

On January 17, 1985, the Federal Trade Commission approved the sale of the various assets by Getty and/or Texaco Inc. to Power Test Corporation (which sale of assets was completed on February 1, 1985). At such closing Getty assigned to Power Test Corporation all of Getty's interest in each of the contracts, leases or other agreements which Getty at that time had with you. In addition, on January 17, 1985, the Federal Trade Commission approved the transfer and assignment of the Getty brand name and Getty trademark to Power Test Corporation which transfer is scheduled to take effect on July 11, 1985.

The occurrence of these events makes the termination of your franchise reasonable under 15 U.S.C. Section 2802(b)(2)(C) of the Petroleum Marketing Practices Act....

Plaintiffs' amended complaint does not allege that Texaco's termination will result in any Getty franchisee losing its supply of gasoline, the lease on its marketing premises or the right to use the "Getty" trademark. Power Test is continuing to supply the franchisees with gasoline, to lease them their marketing premises and to authorize them to use the "Getty" trademark. Plaintiff Russo is operating under a dealer contract with Getty, which was sold to Texaco and then assigned by Texaco to Power Test. Plaintiff Loringer is operating under a contract he entered into directly with the Getty Division of Power Test. Moreover, Power Test, in accordance with its undertaking to the FTC, has offered franchises to all of the service station operators whose supply agreements or locations were transferred to Power Test as a result of the divestiture, and has contractually obligated itself to afford each dealer all of the rights granted to franchisees under the PMPA. This is in accord with the objective of the

divestiture to Power Test—in the words of the FTC order, "to ensure the continuation of the assets as [an] ongoing, viable enterprise, engaged in the same business in which the properties are presently being employed...."

## LAW

Congress was concerned with the power of suppliers and franchisors of service stations to arbitrarily terminate or fail to renew franchises. Since the franchisors generally have enormous economic power, particularly in times of oil shortages, and the franchisees are usually small business people, some limit on the common law powers of the oil companies to deal with whom they wished was deemed essential. *See generally* Petroleum Marketing Practices Act, P.L. 95–297, 92 Stat. 322, S.Rep. No. 95–731, p. 17, 1978 U.S.Code Cong. & Ad. News 873, 876 ("disparity of bargaining power"); Hearings before the Subcommittee on Energy and Power of the Committee on Interstate and Foreign Commerce, H.R. No. 94–136, 94th Cong. 2d Sess. The states have adopted similar protections. *See Bellmore v. Mobil Oil Corporation,* 783 F.2d 300 (2d Cir.1986).

■ The "gist" of the legislative history and case law "is that Congress was much concerned with the coercive relationship between the franchisor and the franchisee and adopted the PMPA to protect the franchisee from arbitrary and discriminatory acts of franchisors." *Bellmore v. Mobil Oil Corporation, supra* at 304. While "the Act must be given a liberal construction consistent with its overriding purpose to protect franchisees," *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1221 (7th Cir.1982), we must also bear in mind that it constituted a diminution of prior rights of franchisors and thus should not be extended beyond the Act's language and purpose. *Cf. Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 58–59 (2d Cir.1984); *Checkrite Petroleum, Inc. v. Amoco Oil Co.,* 678 F.2d 5, 8 (2d Cir.) ("Strict construction is particularly appropriate where, as here, the statute in question is in derogation of common law

rights"), *cert. denied,* 459 U.S. 833, 103 S.Ct. 74, 74 L.Ed.2d 73 (1982).

There is no legislative history dealing with the kind of massive divestiture associated with the trademark transfer involved in the present case—particularly one approved by the FTC. Legislative history provides only indirect guidance in this unusual factual situation.

■ Section 2802(b)(1)(B) of the PMPA provides that "[a]ny franchisor may terminate any franchise" so long as "such termination is based upon a ground described in [§ 2802(b)(2) ]." The permissible ground for termination described in § 2802(b)(2)(C) —the provision relied upon in Texaco's termination notice—is as follows:

> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable, if such event occurs during the period the franchise is in effect....

Thus, the issue is whether Texaco's divestiture of Getty's marketing assets to Power Test constitutes "an event relevant to the franchise" as a result of which termination is "reasonable."

The term "franchise relationship" is defined by the PMPA to mean "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." 15 U.S.C. § 2801(2). The term "franchise" is defined by the PMPA to mean "any contract" under which a refiner or distributor authorizes or permits use of a trademark in connection with the sale of motor fuel, 15 U.S.C. § 2801(1)(A), including "any contract ... under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises ..." 15 U.S.C. § 2801(1)(B)(i).

As a result of the divestiture, Texaco has no contracts with plaintiffs pertaining to the sale or distribution of motor fuel—an essential prerequisite for the existence of a "franchise" under the PMPA. *See Bsales*

*v. Texaco, Inc.,* 516 F.Supp. 655, 661 (D.N.J.1981); *Brown v. American Petrofina Marketing, Inc.,* 555 F.Supp. 1327, 1331–32 (M.D.Fla.1983), *aff'd without op.,* 733 F.2d 906 (11th Cir.1984). Nor does Texaco have any contractual relationship with plaintiffs authorizing or permitting them to occupy their leased marketing premises, since Texaco has divested ownership and control of those premises to Power Test. Finally, Texaco does not own or control the "Getty" trademark—the mark was transferred to Power Test under the divestiture terms approved by the FTC; Texaco is thus disabled from authorizing or permitting plaintiffs to use the "Getty" trademark in connection with the sale or distribution of motor fuel, another conceded essential prerequisite to the existence of a "franchise" between Texaco and plaintiffs.

Termination of plaintiffs' franchises was the inevitable consequence of the various massive transfers approved by the FTC. Significantly, plaintiffs themselves concede that the divestiture was an event which has eliminated every element on which the existence of such a franchise relationship could be predicated.

Divestiture of Getty's marketing assets to Power Test is "an event relevant to the franchise relationship" between plaintiffs and Texaco. Whether the termination of that relationship was "reasonable" depends upon the business and legal sense of the situation.

Section 2802(c) of the PMPA specifically enumerates events which are deemed to be "relevant to the franchise relationship and as a result of which termination of the franchise is ... reasonable" under § 2802(b)(2)(C). If the event on which the franchisor relies for termination falls squarely within that list, the termination is conclusively presumed to be reasonable under § 2802(b)(2)(C), and the court's inquiry is at an end. *See Lugar v. Texaco,* 755 F.2d 53, 59 (3d Cir.1985). Where an event is similar to one enumerated, the courts must deem that event a permissible ground for termination. *See Hifai v. Shell Oil Co.,* 704 F.2d 1425, 1429–30 (9th Cir.1983).

At least three of the enumerated events in § 2802(c) involve situations where the occurrence of the event disables the franchisor from providing an essential element of the franchise—"loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease;" "condemnation or other taking, in whole or in part, of the leased marketing premises pursuant to the power of eminent domain;" and "loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise." 15 U.S.C. § 2802(c)(4), (5) and (6).

Each of these statutorily defined events suggests an involuntary loss of the right to franchise by the franchisor. The loss was voluntary here in the sense that Texaco's uncoerced purchase of Getty placed it in the position it found itself as a possible antitrust violator. We can also assume for the purposes of this opinion that the terms of divestiture originated with Texaco in order to forestall FTC disapproval. Involuntariness is not, however, a sine qua non of reasonableness.

■ There is nothing in the language of the Act suggesting that a major national acquisition and large scale divestiture for bona fide business reasons was intended to be stymied by the right of individual franchisees to insist on a prior relationship on exactly its former terms. A permanent status quo in the relationships of major national oil corporations with each other was not mandated by Congress through the PMPA. In a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors. Change may be required for survival. The fact that Texaco voluntarily put itself in the position where the FTC required divestiture does not necessarily freeze it into a fixed relationship between franchisor and franchisee.

The legislation recognized the "legitimate needs of a franchisor to be able to terminate a franchise based upon ... changes in circumstances." S.Rep. No. 95–731, 95th Cong., 2d Sess. 18–19, *reprinted*

*in* 1978 U.S.Code Cong. & Ad.News 873, 877. Congress expressly recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing marketing conditions and consumer preferences." *Id.* at 19, 1978 U.S. Code Cong. & Ad.News at 877.

What is reasonable depends upon good faith business judgments of the parties. Here those judgments involved many millions of dollars in assets of three large corporations—Texaco, Getty and Power Test. Nothing in the record suggests that these agreements were made to disadvantage franchisees individually or collectively.

Courts are not in a position to second guess management on the reasonableness of their business judgments in cases such as this. Protections of the public against overreaching to the detriment of the gasoline consumer and small businesses which serve their communities is assigned to the FTC, not judges.

Nothing in the record suggests that the FTC did not do its duty. The Commission made it clear that it was not prepared to rubber stamp the Texaco-Power Test agreement. FTC Analysis, 49 Fed.Reg. at 8559. Prior to the entry of the final order, the FTC insisted that Texaco would be required to divest ownership of the Getty trademark and brand name. That requirement was approved by the FTC—whether or not it was the brainchild of the oil companies' counsel.

Even if the absolute divestiture of the Getty trademark to Power Test had its genesis in a prior, private agreement between Texaco and Power Test, it was ultimately imposed by the final FTC Order of July 10, 1984 requiring that "[w]ithin 12 months of the date of service of this order, Texaco shall divest, absolutely and in good faith, the Schedule A properties," and which explicitly included as part of those Schedule A properties "the 'Getty' brand name" and the " 'Getty' trademark ..." order, II(A) and Schedule A(1); 49 Fed. Reg. at 30060, 30062.

█ Under these circumstances Texaco's loss of the Getty trademark resulted from the FTC's divestiture order. It conclusively establishes, without more, the reasonableness of Texaco's termination under § 2802(b)(2)(C).

While an FTC order requiring the divestiture of all the requisite elements of a franchise relationship is not the kind of event that Congress contemplated, Congress provided for this possibility by specifically making the enumerated list in § 2802(c) only illustrative, not exclusive. Thus, § 2802(c) clearly states that section 2802(b)(2)(C) "includes events such as" those enumerated. As the Senate Report regarding the PMPA explains:

> Subsection (c) of section [2802] sets forth an illustrative list of such events. The enumerated list is not exclusive. Other events satisfying the statutory standards set forth in section [2802](b)(2)(C) but not enumerated in the list set forth in subsection (c) of section [2802] may nevertheless serve as a ground for termination or nonrenewal under section [2802](b)(2)(C).
>
> However, the enumerated list is intended to provide a measure of Congressional intent with respect to the meaning of the statutory standard. For that reason the term "includes events such as" is utilized. Thus, a judicial determination may be made that an event, other than one enumerated in this list, or an event similar but not identical to one enumerated in the list constitutes an event which is relevant to the franchise relationship as a result of which termination or nonrenewal is reasonable.

S.Rep. No. 95–731, at 38, *reprinted in* 1978 U.S.Code Cong. & Ad.News, at 896.

Using § 2802(c)'s enumerated list as "a measure of Congressional intent with respect to the meaning" of § 2802(b)(2)(C), the courts have held that where a non-enumerated event is sufficiently similar to one or more enumerated events, the non-enumerated event constitutes a permissible ground for termination (or non-renewal) under § 2802(b)(2)(C). *See Moody v. Amoco*

*Oil Co.,* 734 F.2d 1200 (7th Cir.1984); *Hifai v. Shell Oil Co.,* 704 F.2d 1425 (9th Cir. 1983); *Lanham v. Amoco Oil Co.,* 481 F.Supp. 405 (D.Md.1979). As the Seventh Circuit recently explained in *Moody:*

> Section 2802(c) provides examples of relevant events for which termination is reasonable ... Congress ... did not intend the list to be exclusive; other events may serve as grounds for termination. Courts must carefully scrutinize grounds that are not listed to make certain the statutory standard of relevance and reasonableness has been met.

734 F.2d at 1217 (citations omitted). The court continued:

> In determining whether the ground relied upon for termination is proper under section 2802(b)(2)(C) we must look to the purposes of the PMPA. *Brach v. Amoco Oil Co.,* 677 F.2d 1213 (7th Cir.1982). In *Brach,* this court found that Congress, in enacting the PMPA, sought to protect franchisees from arbitrary terminations ... while allowing franchisors to exercise reasonable business judgment. Section 2802(b)(2)(C) helps maintain that balance by allowing termination for unforeseen yet reasonable grounds.

*Id.*

The rather sparse legislative history of the PMPA suggests that "loss" within these sections is intended to cover voluntary as well as involuntary situations. Thus, the Senate Report states that even where the expiration of an underlying lease results from the franchisor's voluntary decision "not to exercise an option to renew the underlying lease," the resulting loss of the franchisor's right to grant possession of the leased marketing premises is a permissible ground for termination under § 2802(b)(2)(C). S.Rep. No. 95–731 at 38, 1978 U.S.Code Cong. & Ad.News at 896. *Accord, Lugar v. Texaco Inc.,* 755 F.2d 53 (3d Cir.1985); *Veracka v. Shell Oil Co.,* 655 F.2d 445 (1st Cir.1981); *Bernardini v. Exxon Corp.,* 1981–1 Trade Cas. ¶ 63,921 (E.D.Pa.1981); *Sachi v. Mobil Oil Corp.,* 1980–1 Trade Cas. ¶ 63,044 (E.D.N.Y.1979).

While not decisive under the statute, it is relevant in indicating that the FTC's action was not inconsistent with the PMPA requirements that plaintiffs received substantial protections. Plaintiffs will not lose possession of their marketing premises as a result of the divestiture to Power Test. Plaintiff Loringer has already entered into a lease agreement directly with the Getty division of Power Test. Plaintiff Russo and the other Getty franchisees, continue to lease their present stations, continue to be supplied with gasoline and continue to operate under the Getty trademark.

The FTC-ordered divestiture of Getty's marketing assets is just such an unforeseen event—and presents just such a circumstance for balancing. To alleviate potential anticompetitive effects of the Getty merger, while allowing the merger to proceed, the FTC comprehensively regulated the merger on a nationwide basis. The Order regulates the entire merger in minute detail, including the divestiture to Power Test. *Van de Kamp v. Texaco Inc., supra,* slip op. at 8, 16. The PMPA, as plaintiffs would have it applied, would prohibit action that the federal government specifically authorized.

The purpose of the PMPA is to establish "minimum standards governing the termination and non-renewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." S.Rep. No. 95–731, 95th Cong.2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873. As the Second Circuit observed in *Checkrite Petroleum, Inc. v. Amoco Oil Co.,* 678 F.2d 5, 9 (2d Cir.1982), "[t]he PMPA is aimed at preventing unfair and discriminatory termination of franchises by franchisors." Power Test has agreed, contractually, to be bound by the terms of the PMPA. In this case, the basic protectionist policy underlying the PMPA has been carried out by the FTC and the defendants.

The FTC had the authority to review the merger between Texaco and Getty, 15 U.S.C. § 18a, and take appropriate action,

including negotiating an enforceable consent order. 16 C.F.R. §§ 2.31–2.35. The FTC developed a regulatory scheme which, in its judgment, alleviated the potential antitrust problems and considered the very PMPA arguments that plaintiffs reiterate in this case.

Plaintiffs simply disagree with the FTC's solution. They cannot attempt, through this action, to replace a Commission decision with one by the court.

To allow plaintiffs to substitute their judgment for that of the FTC would " 'stand as an obstacle' to federal efforts to enforce the antitrust laws against large mergers through consent orders." *Van de Kamp, supra*, slip op. at 24. In addressing a preemption question, the *Van de Kamp* court examined the Texaco-Getty merger from which this case arises. That court's reasoning with regard to the necessity of preserving the FTC's ability to negotiate consent orders involving large mergers is apposite here. After describing the purpose of the Hart-Scott-Rodino Anti-Trust Improvements Act, the court noted that to disallow the acquisition would "unravel[ ] the entire federal regulatory scheme embodied in the order," and that "[t]he bargaining power of the federal government— the ability to extract pre-consummation concessions from the merging parties in exchange for a promise not to sue—would be lost". *Id.* at 26–27.

## CONCLUSION

Summary judgment on the Petroleum Marketing Practices Act claims is granted. No motion having been made on the Clayton Act claims, the action may proceed. There is no reason for an appeal before the action is finally terminated. A final partial judgment shall not be entered. *See* Rule 54(b) of the Federal Rules of Civil Procedure. An interlocutory appeal will not materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).

SO ORDERED.