**CEDAR BROOK SERVICE STATION, INC., et al., Plaintiffs,**

v.

**CHEVRON U.S.A., INC., and Cumberland Farms, Inc., Defendants.**

**No. CV–86–4240.**

United States District Court, E.D. New York.

June 7, 1989.

Cohen, Millstein & Hausfeld, Washington, D.C., Arnold P. Azarow, Garden City, N.Y., for plaintiffs.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Cumberland Farms., Inc.

Matthew F. FitzGibbon and Frank M. Ciuffani, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for defendant Chevron, U.S.A., Inc.

COSTANTINO, District Judge.

### BACKGROUND

In 1984 Chevron U.S.A. Inc. ("Chevron") acquired the Gulf Corp. ("Gulf"). Under the terms of a consent order between Chevron and the Federal Trade Commission (the "Hold Separate Order"), Chevron was required to operate the Gulf assets separately from its own, exercising no direction or control over them until Chevron divested itself of certain Gulf assets. Prior to the March 13, 1985 termination of the "Hold Separate Order", Chevron was permitted access to Gulf's business records to the extent necessary to complete the required divestitures.

As a result of the Gulf acquisition, Chevron's aggregate debt exceeded $15 billion. To reduce this debt, Chevron initiated market studies to identify which of its assets

(either acquired from Gulf or held by Chevron prior to the Gulf purchase) it could most profitably sell.

Upon termination of the "Hold Separate Order" a study team was created within Chevron for the specific task of further evaluating the possible sale of Chevron's Philadelphia refinery and its marketing assets in a number of Northeast and Mid–Atlantic States. The study team solicited bids for these assets, informing the prospective buyers that no decision had been made to sell any particular assets and informing them that authority to approve any sale rested not with the team, but with Chevron's Board of Directors.

On September 20, 1985, Chevron sent prospective purchasers specific bidding instructions and a draft sale agreement. The bidding instructions stated that Chevron could reject any and all bids, and that if Chevron's Board of Directors tentatively decided to accept a bid, final approval would be subject to the negotiation and execution of a binding purchase and sale agreement.

On November 7, 1985, Chevron's Board tentatively accepted a bid from Cumberland Farms, Inc. ("Cumberland") for Chevron's motor fuel marketing assets in the ten Northeast states of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, Pennsylvania, New Jersey and Delaware. Chevron has retained its Philadelphia refinery and the marketing assets in the mid-atlantic states of Virginia and Maryland, as well as the District of Columbia.

On December 19, 1985, Chevron and Cumberland signed an asset purchase agreement which covered petroleum product distribution terminals, warehouses, office locations, trucks and other vehicles, 494 service station properties and all associated inventories and accounts receivable. In addition, the sale transferred to Cumberland supply contracts with approximately 300 Gulf and Chevron branded "Jobbers" (who maintain storage tanks and trucks for the sale of petroleum products to Gulf and Chevron branded service stations), more than 400 lessee service station dealers and

900 service station dealers who own their own stations.

In structuring the sale, Chevron took numerous steps to minimize disruption to the ongoing Gulf and Chevron dealer operations. These steps included requiring Cumberland, by the terms of the Asset Purchase Agreement, to assume all of Chevron's contractual commitments, including its dealer leases and supply agreements. Further, as franchise agreements came up for renewal, Cumberland was required to offer, in good faith, a new franchise to each dealer on terms and conditions which were not discriminatory.

To ensure that the "Gulf" trademark remained available to Gulf dealers, Chevron granted Cumberland exclusive use of the trademark at Northeast stations for 15½ years with an option to renew indefinitely. Provisions were also made to protect the value of the Gulf and Chevron credit card systems, and Chevron agreed to sell Cumberland virtually the entire gasoline output of its Philadelphia refinery.

On November 8, 1985, Chevron notified all Gulf and Chevron dealers in the Northeast that it was entering final sale negotiations with Cumberland.

On February 14, 1986, Chevron notified all Gulf and Chevron dealers affected by the sale that it would not renew their franchises, but had assigned its rights and delegated its duties to Cumberland, which would honor the provisions of all agreements and offer nondiscriminatory franchise renewal agreements upon expiration of each dealer's current agreements with Chevron. The sale closed on May 31, 1986.

Plaintiffs, 11 service station dealers in New York, were leasing their stations from defendant Chevron at the time of the sale to defendant Cumberland. Each plaintiff also purchased its gasoline from Chevron under product supply agreements for resale under the Gulf trademark.

Plaintiffs claim that the Northeast sale violated the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. (1982) (PMPA) as well as New York law, and seek to have the sale set aside and be afforded the

chance to purchase from Chevron the stations they were leasing under their franchise agreements.

The PMPA was enacted to protect dealers, who are generally small business persons, from arbitrary termination or non-renewal of their franchise relationships with powerful refiners. Senate Report No. 95–731, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, 873 defines the term franchise as a "motor fuel trademark license." It further provides that "[s]econdary arrangements, such as leases of real property or motor fuel supply agreements, are incorporated in the definition of a franchise [so that the Act] may not be circumvented by a termination or non-renewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless." *Id.* at 29, U.S.Code Cong. & Admin.News 1978, at 888.

Thus, to achieve its protective function, the PMPA "prohibits a franchisor from terminating a franchise during the term of the franchise agreement and from failing to renew the relationship at the expiration of the franchise term, unless the termination or non-renewal is based upon a ground specified or described in the legislation...." *Id.* at 15, U.S.Code Cong. & Admin.News 1978, at 874. Section 2805(c)

of the PMPA provides that "[i]n any action ... the franchisee shall have the burden of proving the termination of the franchise or the non-renewal of the franchise relationship."

Plaintiffs claim that the Northeast transaction resulted in non-renewal of their franchises under the PMPA as a matter of law, and that defendants are collaterally estopped from claiming otherwise by *Florham Park Chevron, Inc. v. Chevron,* 2 Bus. Franchise Guide (CCH) ¶ 9011, 1987 WL 17496 (D.N.J.1987) (Florham Park I). Defendants have filed a motion for summary judgment, arguing that the PMPA expressly permits assignments of franchise agreements from one franchisor to another which, if valid under state law, do not invoke the PMPA at all. Because the assignments of plaintiffs' franchise agreements were valid under New York law, defendants contend, no termination or non-renewal occurred and no cause of action under the PMPA arose.

Defendants also claim that even if they did trigger the PMPA by their transaction, they fully complied with the affirmative defense set forth in § 2802(b)(2)(E) of the PMPA, which permits termination or non-renewal of a franchise relationship where a franchisor withdraws from a marketing area if certain conditions are met.[1] Plain-

---

1. Specifically, § 2802(b)(2) provides, in pertinent part, that:

[T]he following are grounds for termination of a franchise or non-renewal of a franchise relationship:

(E) In the case of any Franchise ... entered into or renewed on or after [the enactment of the PMPA] (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(i) such determination—
(I) was made after the date such franchise was entered into or renewed, and
(II) was based upon the occurrence of changes in relevant facts and circumstances after such date;

. . . . .

(iii) in the case of leased marketing premises—

(I) the franchisor, during the 180 day period after notification was given pursuant to Section 2804 of this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor's interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

tiffs take issue with numerous aspects of defendants' claim that the terms of § 2802(b)(2) were met. Initially, they argue that factual issues, unsuitable for disposition on summary judgment exist regarding Chevron's "good faith determination" to withdraw from the Northeast.

Second, plaintiffs claim that there occurred no "changes in relevant facts and circumstances" to justify the decision to withdraw.

Third, plaintiffs contend that the issue of Cumberland's good faith in offering nondiscriminatory renewal franchises is inappropriate for summary judgment and that defendants are collaterally estopped by *Florham Park Chevron, Inc. v. Chevron*, 2 Bus. Franchise Guide (CCH) ¶ 9012, 1984 WL 19492 (D.N.J.1987) (Florham Park II) from arguing to the contrary. Even if defendants are not estopped, say plaintiffs, factual issues exist regarding Cumberland's good faith that require consideration by a jury.

Fourth, plaintiffs note, and defendants agree, that Cumberland was not a "franchisor" at the time of the sale. Plaintiffs claim this fact made it impossible—at least as to the first dealer whose franchise with Chevron expired following the sale—for Cumberland to satisfy the requirement of § 2802(b)(2)(E)(iii)(II) that it offer the franchisees new franchises "which are not discriminatory to the franchisee[s] as compared to franchises then currently being offered" or "then in effect and with respect to which such other person is the franchisor."

Defendants argue that the PMPA does not mandate that only existing franchisors may purchase the interests of a withdrawing franchisor. To hold that it did amount to a restraint of trade which would stratify the market place and limit the flexibility of withdrawing franchisors in contravention of congressional intent. Finally, plaintiffs' claim that defendant, Cumberland Farms violated § 199–b of the NYS GBL by failing to make disclosures required there under. Cumberland claims that all disclosures were either made or unnecessary.

## DISCUSSION

### A. Did the Northeast transaction invoke the PMPA?

Defendants argue that they are entitled to summary judgment because the sale of properties by Chevron to Cumberland was neither a termination nor a non-renewal and therefore could not give rise to a cause of action under the PMPA. Defendants first point out that the PMPA seeks to protect franchisees from arbitrary termination or non-renewal while also allowing "any transfer or assignment of any franchise as authorized by ... any applicable provision of state law." Brief for Defendant Chevron at 14, *Cedar Brook Service Station, Inc., et al. v. Chevron U.S.A. Inc., et al.* (quoting 15 U.S.C. § 2806(b) (1982)).

Plaintiffs presently occupy the same stations under their original leases or renewal leases with Cumberland, purchase Gulf gasoline under original or renewal leases and do business under the Gulf trademark. These protections, defendants argue, coupled with the fact that New York State permits the assignment of contractual rights and obligations of the types involved here, compel this court to conclude that the PMPA was not invoked by the Northeast transaction because the requirement that either a non-renewal or termination occur was not met.

As plaintiffs point out, the issue of whether Chevron's sale of its northeast marketing assets to Cumberland resulted in non-renewal of franchise agreements between Chevron and its franchisees whose stations were sold was resolved against Chevron in *Florham Park I*.

Plaintiffs request this court to invoke the doctrine of collateral estoppel to prevent relitigation of this issue, claiming that the defendants fully (though unsuccessfully) litigated in *Florham Park I* the identical factual and legal issues they raise here regarding non-renewal versus assignment. Putting to one side plaintiff's request, the substance of the *Florham Park I* decision must be addressed.

As the *Florham Park I* court correctly notes, non-renewal means "a failure to re-

instate, continue, or extend the franchise relationship ... at the conclusion of the term, or on the expiration date, stated in the relevant franchise." 2 Bus. Franchise Guide (CCH), ¶ 9011 at 6 (D.N.J.1987) (citing 15 U.S.C. § 2801(14)(A)). The Court's analysis first focuses however, on the PMPA's § 2801(2) definition of "franchise relationship" as the obligations and responsibilities of a franchisor and franchisee relating to marketing, supply and distribution agreements.

Although this court agrees with the *Florham Park I* court that "Chevron fail[ed] to extend its franchise relationship with plaintiffs," which resulted in non-renewals "despite any assignment of the leases to Cumberland," 2 Bus. Franchise Guide (CCH) ¶ 9011 at 8, the *Florham Park I* court overlooked what this court believes is a clear distinction between the § 2801(2) definition of franchise relationship and the use of the term "franchise relationship" in § 2802(b)(2)(E).

Senate Report No. 731, 95th Cong.2d Sess. 30 (1978), U.S.Code Cong. & Admin. News 1978, 888 states, in part, that "[t]he renewal provisions of the title address the renewal of the *relationship* between the parties rather than the *specific rights or obligations* of the parties under the franchise agreement." · (emphasis added). Thus regardless of whether or not the plaintiffs in *Florham Park I* and the case at bar were afforded protection of their franchise *rights* as delineated in § 2801 of the PMPA and defined in Senate Report No. 731 at 29, U.S.Code Cong. & Admin. News 1978, at 888, *see supra,* non-renewal of the franchise relationship between plaintiffs and Chevron could occur as a matter of law. *See, Chestnut Hill Gulf, Inc., et al. v. Cumberland Farms, Inc. and Chevron, U.S.A., Inc.,* C.A. No. 86–3519 at 3–5, 1988 WL 114441 (E.D.Ma.1988).

Both the *Florham Park I* and *Chestnut Hill* courts refer to the notice sent by Chevron to all Northeast franchisees in-

forming them that Chevron would not renew existing lease and supply agreements, but had assigned these obligations to Cumberland. Although Chevron couched this notice in precautionary terms, i.e., in case it was claimed that the sale and assignments to Cumberland constituted a non-renewal under the PMPA formal notice of non-renewal was being given Chevron's reason for the assignments urges a finding that non-renewal did occur. Chevron withdrew from marketing through retail outlets in the entire Northeast by its own admission. Indeed, the market withdrawal provision of the PMPA is an *explicit affirmative defense to a termination or non-renewal.* If Chevron is correct that it completely withdrew from retail marketing in the Northeast, then clearly its relationship with the plaintiffs was, or will be, nonrenewed. *See, Bruce A. Smith, et al. v. Cumberland Farms Inc., and Chevron U.S.A. Inc.,* C.A. No. 87–1001. The fact that plaintiffs were granted continued use of the Gulf trademark and protected in their lease and supply agreements goes only to the *legality* of Chevron's market withdrawal under New York State law and section 2802(b)(2)(E), and not to the issue of whether non-renewal occurred in the first place.[2]

Defendants cite several cases in support of their contention that a franchise assignment that is valid under state law can be neither a termination nor non-renewal. This was the holding of *May–Som Gulf, Inc. v. Chevron,* 2 Bus. Franchise guide (CCH) ¶ 9000, (N.D.Ohio 1987) which recently was affirmed by the Sixth Circuit 869 F.2d 917 (6th Cir.1989). In affirming *May-Som* however, the Sixth Circuit—without saying it was doing so—modified the district court's rather bald assertion that no assignment valid under state law may be a termination or non-renewal. The Sixth Circuit adopted the explanation of the Fourth Circuit in *Barnes v. Gulf Oil Corp.,* 795 F.2d 358 (4th Cir.1986) that a franchise consists of "three elements: 'a contract to

---

2. Had Chevron not taken appropriate steps to protect the franchise right of its franchisees and thereby run afoul of New York state laws regarding assignment of contractual obligations, plaintiff's argument, assumably, would be that

their franchises were constructively terminated not non-renewed. Whether a constructive termination can be cured by a proper market withdrawal in light of Section 2806(b), discussed *infra,* need not be decided here.

use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold.'" *May-Som*, 869 F.2d at 922 (quoting *Barnes*, 795 F.2d at 360). It then held that a claim for constructive termination due to assignment of a franchise can be sustained under the PMPA only where the franchisee "prove[s] either: (1) that by making the assignment, the franchisor breached one of the three statutory components of the franchise agreement, ... *or* (2) that the franchisor made the assignment in violation of state law and thus, the PMPA was invoked." *Id.* 869 F.2d at 922 (emphasis added). Thus under the Sixth Circuit's formulation, as evidenced by its use of the disjunctive, a constructive termination may occur even where a valid assignment is effected. Reason supports the Sixth Circuit's holding, as the PMPA serves a protective function that may well extend beyond that of a state's laws on assignability of contracts.

Section 2806(b) of the PMPA, which states that "[n]othing in this subchapter authorizes ... or prohibits any transfer or assignment of any franchise as authorized by ... any applicable provision of state law", does not, as defendant's argue, compel a contrary conclusion. This section should be read not to alter the meaning of "nonrenewal" of a franchise relationship, but rather to indicate the applicability of state law to franchise assignments. Defendants cannot be heard to argue that state law validity exempts a transaction from the terms of the PMPA when § 2802(b)(2)(E)(iii)(II) explicitly provides

that grounds for non-renewal exist "[i]n the case of ... assignment to another person of the franchisor's interest ... if such other person offers." *Id.* (emphasis added).

The PMPA does not pre-empt state law on the issue of valid assignment, as § 2806(b) plainly states. But the PMPA divorces the issue of assignability from that of proper non-renewal in § 2802(b)(2)(E)(iii)(II), which imposes conditions for legal non-renewal *following* an assignment. *See, Chestnut Hill* at 5.[3]

As noted above, Senate Report No. 731, 95th Cong.2d Sess. 30 (1978), U.S.Code Cong. & Admin.News 1978, 888 states that "[t]he renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement." In light of this pronouncement, separation of the state law assignability issue from that of permissible PMPA non-renewal is necessary and proper. The contractual rights of parties, like the plaintiff are protected, in the first instance, by state law. Non-renewals that occur by way of valid franchise assignments or transfers in the context of a market withdrawal must then meet the strictures of § 2802(b)(2)(E). This avoids the problem of wide disparity between states in providing protection against unfair assignment. Regardless of the terms under which the franchise was assigned—which obviously will vary by state—the PMPA protections, by not being tied to the valid assignment issue, will be uniform.

---

**3.** It should further be noted that *May-Som I*, on which defendants heavily rely, derived its holding that "[i]f an assignment is valid under state law, it is neither a termination nor a non-renewal" from two cases that provide tenuous support for this proposition. *Aldrich v. Amoco Oil Co.,* Bus. Franchise Guide (CCH) ¶ 8322 (1985–1986 Transfer Binder) 1985 WL 6098 (S.D.Iowa 1985) held only that "[u]nder these facts the court concludes that plaintiff's franchise has not been terminated." *Id.* at 15,113. The "facts" the *Aldrich* court found dispositive involved aspects of the franchise relationship as well as assignment of interests, and the case thus offers scant support for the *May Som* holding. More importantly, *McGee v. Gulf Oil Corp.,* Bus. Franchise Guide (CCH) ¶ 8379 (1985–1986 Transfer Bind-

er) (N.D.Ala.1985) held that "[t]he PMPA ... leaves the question of assignability to state law, clearly implying that an assignment or transfer of a franchise, *by itself,* does not constitute a termination." *Id.* at 15,348. (emphasis added). This language, quoted in defendants' brief, can only be viewed as evidence of the court's recognition that valid assignment does not negate the non-renewal issue, but is simply divorced from it. The *McGee* and *Aldrich* courts are in harmony with the text of PMPA § 2802(b)(2)(E)(iii)(II) and *not,* as defendants claim, supportive of the *May-Som I* holding that the PMPA requirement of proper grounds for non-renewal is avoided or satisfied by a valid state law assignment standing alone.

This court concludes that Chevron's decision to withdraw from retail marketing in the Northeast led, as a matter of law, to non-renewal of the plaintiff's franchise relationship with Chevron. This is so regardless of whether or not the franchises were validly assigned to Cumberland, and summary judgment is thus not supportable on this basis.

B. Are Chevron and Cumberland entitled to summary judgment for having complied with the market withdrawal provisions of the PMPA?

Initially it should be noted that Chevron *did* withdraw from the Northeast market under the plain terms of § 2802(b)(2)(E). Despite the fact that Chevron continued its refining activities in Philadelphia and still sells fuel at the wholesale level, it is not marketing through retail outlets in the Northeast and so has withdrawn within the meaning of the PMPA. *See, Florham Park I,* 2 Business Franchise Guide (CCH) 9011 (D.N.J.1987) (noting that "Chevron's licensing of its trademarks to Cumberland Farms is not even 'marketing'" and that although "Chevron motor fuel continues to be marketed in the relevant geographic area[ ] Chevron ... no longer markets the fuel." *Id.* at 11.

As noted above, section 2802(b)(2)(E) of the PMPA permits non-renewal of a franchise relationship when the franchisor withdraws from the relevant marketing area provided that: (1) the franchisor has given proper notice to the affected franchisee(s), (2) the franchise agreements are for a period of at least three years, (3) the franchisor's decision to withdraw has been made in good faith and in the normal course of business, (4) the franchisor's decision to withdraw has been made after the most recent renewal of the franchise agreement and is based on changes in relevant facts and circumstances, and (5) the new franchisor offers to renew the franchises on terms that are non-discriminatory as compared to other franchise arrangements then being offered by that franchisor.

The first four of these factors will require consideration of Chevron's actions and intentions while the fifth will involve

both Chevron and Cumberland. Summary judgment will be granted if, drawing all inferences in favor of the non-moving party, "... the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Rule 56(e) further provides, in relevant part, that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

There is no dispute that the term of each plaintiff's lease was at least three years. As to sufficiency of the notice of non-renewal, plaintiffs assert, without explanation, that they were not given the 180 days required by section 2804 of the PMPA.

Defendants contend and this court agrees, that if plaintiffs are claiming that they received fewer than 180 days notice because only 106 days elapsed between the date notice was given and the closing, their argument is meritless. Chevron's notices of February 14 stated that non-renewal would occur at the later of (i) expiration of the dealer's current agreements or (ii) 180 days after the dealer's receipt of the notice.

As the court held in *Florham Park I,* [f]or those plaintiffs whose prior franchises expired more than 180 days after February 14, 1986, proper notice clearly was given. As for those plaintiffs whose prior franchises expired within 180 days after February 14, the notice ... effectively extended the franchise relationship from the original expiration date until 180 days from receipt of the February 14 notice. For these plaintiffs, non-renew-

al—failure to extend the franchise relationship—did not take effect until this later date. *Id.* at 18, 421.

The fact that Chevron delegated its contractual obligations to Cumberland beginning on the closing date does not mean that non-renewal then occurred. Chevron remained a guarantor under each assigned contract until it expired, effectively preserving its relationship with each franchisee.

Plaintiffs also contest Chevron's assertion that it made its decision to withdraw in good faith, based on changes in relevant facts and circumstances.

Senate Report No. 95–731 provides guidance for evaluating a franchisor's determination to withdraw from a market. Specifically, the report sets forth:

> a two-fold test ... to judge certain specified determinations including that of market withdrawal.
>
> One test is whether the determination was made 'in good faith'. This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made 'in the normal course of business'....
>
> These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself.

*Id.* at 37, U.S.Code Cong. & Admin.News 1978, at 896.

In support of their claim that issues of material fact exist regarding Chevron's good faith, plaintiffs note that Chevron rejected a substantially higher offer from Getty for the assets sold to Cumberland. Plaintiffs argue that Getty, an established franchisor, was a more desirable purchaser from the perspective of all effected franchisees but that defendants rejected Getty's bid because Cumberland offered a better benefit package for the employees it took on from Chevron.

Additionally, plaintiffs claim that Chevron's knowledge that Cumberland is a Chapter S private corporation engaged primarily in the realty and convenience store business demonstrates Chevron's bad faith in making the sale. Plaintiffs argue that Chevron's failure to tell them of the impending sale until the final stages of negotiation had been entered was a clear indication that Chevron knew it had compromised the best interests of its franchisees by selling their stations to a company which might treat the purchase primarily as a real estate investment.

Plaintiffs conclude that Chevron's willingness to complete the sale despite the foregoing circumstances raises a factual question as to whether Chevron made a sham determination to withdraw from the Northeast or acted in good faith.

The court is not prepared to agree with plaintiffs that Chevron's determination to withdraw from retail marketing in the Northeastern United States was an "artifice for ... non-renewal" of their franchises. S.Rep. at 37, U.S.Code Cong. & Admin. News 1978, at 895.

The Gulf acquisition placed Chevron under a heavy debt obligation which it sought to reduce by the Northeast sale. The record is devoid of any evidence of bad faith, or of decisions made in connection with the Northeast sale other than in the normal course of business. Significantly, the *Florham Park I* and *Florham Park II* courts each found that the same withdrawal decision here at issue was made in good faith. The arguments plaintiffs make regarding Cumberland's business interests and the possibility of improper treatment by Cumberland go to the fifth factor of § 2802(b)(2)(E) and not to the good faith of Chevron's determination to withdraw.

Plaintiffs also contend that the fourth requirement of § 2802(b)(2)(E)(i)(I) and (II), the decision to withdraw made after the most recent franchise renewal based on changes in relevant facts and circumstances, is not satisfied where, as here, a franchisor's decision is not prompted by a change in marketing conditions or consumer preferences.

Defendants answer that the appearance of a suitable purchaser (Cumberland) was a

change in relevant facts and circumstances sufficient to support its withdrawal decision under the PMPA.

Plaintiffs call the court's attention to Senate Report No. 731, which speaks of "changes" and "trends" which "may ... serve as the basis for such a [withdrawal] determination." *Id.* at 34–35, U.S.Code Cong. & Admin.News 1978, at 893. In addition, plaintiffs note that in *Russo v. Texaco, Inc.*, 630 F.Supp. 682 (E.D.N.Y. 1986), *aff'd*, 808 F.2d 221 (2d Cir.1986) Judge Weinstein stated that "franchisors may initiate changes in their marketing activities to respond to changing marketing conditions and consumer preferences." 630 F.Supp. at 688.

The court is not persuaded, however, that either the Senate Report or *Russo* is authority for the proposition that changed market conditions or consumer preferences are the *exclusive* justifications for a withdrawal determination. Indeed, to so hold would be to prohibit the exercise of sound business judgment in *anticipation* of market changes. A corporate decision maker's acumen and prescience under such a rule would be rewarded only by his fulfilled expectation of a crippled bargaining posture and consequent losses sustained upon withdrawal in *response* to the market or consumer preference change. Such a perversity would be indefensible from the perspective of shareholders and could not have been intended by congress.[4]

In light of the foregoing considerations, this court adopts the view expressed by the *Florham Park II* court:

Congress provided a market withdrawal defense to ensure distributors adequate flexibility to respond to changing market conditions

. . . . .

Although Congress included safeguards so that this defense could not be used unfairly, the withdrawal provision must be interpreted to permit adequate

flexibility. Given this intention ... the presence of Cumberland Farms as a willing buyer constitutes the 'change in relevant circumstances' upon which Chevron's withdrawal determination was based.

*Florham Park II*, at 18,426. (*Accord, May–Som I* ("[t]he availability of a suitable buyer was, therefore, a changed circumstance upon which Chevron based its decision"). *Id.* at 18,328. The fifth and final factor of the market withdrawal affirmative defense requires, as noted above, that the purchaser

of the franchisor's interest ... offer[ ] in good faith, a franchise to the franchisee on terms ... not discriminatory to the franchisee as compared to franchises then currently being offered by [the purchaser] or franchises then in effect and with respect to which [the purchaser] is the franchisor. 15 U.S.C. § 2802(b)(2)(E)(iii)(II).

Chevron claims that it satisfied the fifth element of § 2802(b)(2)(E) by including in the Asset Purchase Agreement a term under which Cumberland agreed to tender non-discriminatory renewals to the franchisees. This being so, says Chevron, all claims related to bad faith and discriminatory renewals must be asserted against Cumberland alone. The court disagrees. The PMPA clearly and unambiguously states that a franchisor may assert the market withdrawal defense only where the purchaser of his interests "*offers*, in good faith, a franchise...." 15 U.S.C. § 2802(b)(2)(E)(iii)(II) (emphasis added). The court refuses to reformulate the withdrawal defense by holding it satisfied where a franchisor's purchaser merely *agrees* to offer good faith, non-discriminatory renewals. Such a ruling would significantly diminish the protections afforded franchisees under the PMPA and contravene the statutory language and intent. *See Florham Park I*, 2 Business Franchise

---

**4.** It may further be noted that where a market change does occur franchisees will have gained no benefit by the franchisor's having waited for the downturn. Since the withdrawing franchisor must provide the franchisees the protec-

tions of the PMPA and, most notably, the fifth factor of § 2802(b)(2)(E), the franchisee also is not significantly prejudiced by withdrawal before or even in the absence of a market change.

Guide (CCH) ¶ 9012 (D.N.J.1987); *Ewing v. Amoco Oil Co.*, 823 F.2d 1432 (10th Cir. 1987).

Cumberland Farms seeks summary judgment on the issue of its good faith in offering non-discriminatory renewals to the plaintiffs herein. While maintaining that it satisfied the withdrawal defense irrespective of Cumberland's good faith, Chevron joins Cumberland's motion.

The essence of defendants' claim is that plaintiffs are deliberately mischaracterizing Cumberland's actions and intentions in order to persuade the court that Chevron's market withdrawal was illegally accomplished. Plaintiffs' goal, defendants conclude, is to improperly use the PMPA as a "vehicle" by which to purchase their stations.

Defendants argue that the good faith requirement of the PMPA refers not to the objective reasonableness of a franchisor's acts, but to his subjective intent. They describe, as an example of subjective bad faith, a franchisor who is motivated by his desire to terminate a franchise agreement. Defendants claim that plaintiffs have adduced no facts in support of their contention that Cumberland has acted in bad faith within the meaning of the PMPA, and should therefore have summary judgment entered against them on this issue.

In fact, plaintiffs *have* alleged such facts. Robert M. Quinlan, Vice President of Branded Marketers for Gulf Oil Division of Cumberland Farms, Inc., testified in his deposition that Cumberland owned Gulf stations and convenience store gasoline outlets are billed for fuel under a different pricing formula than lessee dealers (including plaintiffs). Quinlan acknowledged that the price under this formula for lessees is historically higher.

Cumberland's Chief Executive and Chairman, D.B. Haseotes, testified that to increase overall profitability a station could

be (and indeed several have been) sold or converted to another use.

Finally, plaintiffs note that the *Florham Park II* court accepted as evidence an expert's opinion that "based on [a] review of the lease and discovery documents, Cumberland Farms intends to drive dealers out of business and to take over the stations." *Id.*, 2 Business Franchise Guide (CCH) ¶ 9012 (D.N.J.1987) at 5–6.

As did the *Florham Park II* court, this court concludes that plaintiffs have raised a triable issue as to whether Cumberland has acted in bad faith and with discriminatory intent. Although the expert opinion offered in *Florham Park II* does not refer specifically to Cumberland's dealings with the present plaintiffs, it is reasonable to attach significance to that evidence in light of the additional facts alleged. Interestingly, the conclusion reached by the expert in *Florham Park II* regarding Cumberland's ultimate goal bears a striking resemblance to defendants' own definition of subjective bad faith.

Drawing all inferences in favor of plaintiffs, it is clear that a triable issue exists as to Cumberland's subjective intentions regarding the Northeast properties in general and the plaintiffs' franchises specifically. Summary judgment is thus denied to Cumberland on this issue, and to Chevron with respect to the fifth factor of § 2802(b)(2)(E).[5, 6]

SO ORDERED.

---

5. The disposition of this issue makes it unnecessary to consider plaintiffs' arguments that (1) Chevron's market withdrawal was defective because Cumberland was not a franchisor prior to the northeast transaction, and (2) state law provisions mandating certain disclosures were transgressed.

6. The court appreciates and acknowledges the scholarly research of Dale Lois, New York Law School Intern, who researched and drafted this opinion.