808 F.2d 221
 Michael A. RUSSO, t/a Nor-Bridge Service Center, Inc., and
Robert A. Loringer, t/a Bob's Getty Service
Station, Plaintiffs-Appellants,
v.
TEXACO, INC., a Delaware Corporation, and Power Test
Corporation, a Delaware Corporation, Defendants-Appellees.
 No. 225, Docket 86-7520.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 9, 1986.
Decided Dec. 30, 1986.
 
 Jerry C. Cohen, Washington, D.C. (Cohen, Milstein & Hausfeld, Arnold P. Azarow, Westbury, N.Y., of counsel), for plaintiffs-appellants.
 Randolph S. Sherman, New York City (Milton J. Schubin, Claire Shows Hancock, Kaye, Scholer, Fierman, Hays & Handler, New York City, David A. Luttinger, John F. Carberry, White Plains, N.Y., of counsel), for defendant-appellee, Texaco, Inc.
 John F. Collins, Saul P. Morgenstern, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Michael B. Himmel, Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, Woodbridge, N.J., of counsel, for defendant-appellee, Power Test Corp.
 Before CARDAMONE and PIERCE, Circuit Judges, and BONSAL, Senior District Judge.*
 PIERCE, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Eastern District of New York, Weinstein, Chief Judge, entered February 21, 1986, granting appellees' motions for summary judgment and denying appellants' cross-motion for summary judgment, and from a judgment, entered June 3, 1986, dismissing appellants' claims under the Petroleum Marketing Practices Act ("PMPA" or the "Act"), 15 U.S.C. Secs. 2801-2806.
 
 
 2
 Appellants, Michael A. Russo and Robert A. Loringer, maintain that appellee Texaco, Inc. ("Texaco") terminated their franchises in violation of the PMPA. Specifically, they claim that Sec. 2802(b)(2)(C) of the Act which provides that a franchisor may terminate a franchise "upon the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise is reasonable" is not applicable to Texaco's divestment to appellee Power Test Corporation ("Power Test") of certain Getty Oil Company ("Getty") assets, including their Getty franchises.
 
 
 3
 The district court ruled that Texaco's termination of appellants' franchises was permissible under Sec. 2802(b)(2)(C) of the Act. Russo v. Texaco, Inc., 630 F.Supp. 682 (E.D.N.Y.1986). Chief Judge Weinstein's ruling was premised on two grounds. First, he held that Texaco's loss of the right to grant the right to use the "Getty" trademark as a result of a Federal Trade Commission ("FTC" or "Commission") divestiture order fell within Sec. 2802(c) which enumerates certain events any one of which conclusively establishes the reasonableness of termination under Sec. 2802(b)(2)(C). Alternatively, after reviewing the legislative history of the PMPA and the divestiture as a whole, Judge Weinstein concluded that Texaco's termination of appellants' franchises was in any event reasonable under Sec. 2802(b)(2)(C) as an event not enumerated in Sec. 2802(c).
 
 
 4
 Reviewing this question of law de novo, we hold, in substantial agreement with the first prong of Judge Weinstein's opinion, that Texaco's loss of the "Getty" trademark pursuant to the FTC order was an event enumerated in Sec. 2802(c), and therefore that Texaco's termination of appellants' Getty franchises is conclusively presumed to be reasonable under Sec. 2802(b)(2)(C). We do not find it necessary to reach, and therefore do not review, Judge Weinstein's alternative holding that Texaco's termination of the Getty franchises was in any event reasonable.
 
 
 5
 We affirm the judgment dismissing appellants' claims under the Act.
 
 BACKGROUND
 
 6
 This case arises out of Texaco's acquisition of Getty in 1984 and its subsequent sale to Power Test in 1985 of certain Getty assets, including appellants' Getty franchises, pursuant to an order of the FTC. We need not recount here all the facts surrounding those transactions, but only those necessary for an understanding of the issues presented in this appeal.
 
 
 7
 In January 1984, Texaco agreed to acquire the shares and assets of Getty for approximately $10.1 billion. Because of the size of the transaction, FTC review of the acquisition was required under the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. Sec. 18a. Anticipating that it would be necessary to divest certain assets in order to obtain FTC approval, Texaco, on January 27, 1984, agreed to sell to Power Test virtually all of the Getty gasoline station assets, supply contracts, and franchise agreements in the Northeast and Mid-Atlantic regions. Under that agreement, Texaco would have retained ownership of the "Getty" trademark and granted Power Test a license to use the "Getty" mark and name.
 
 
 8
 The FTC was indeed concerned about the antitrust ramifications of the merger between Texaco and Getty. A draft complaint was published in March 1984 which expressed, among other concerns, the FTC's concern that the effect of the acquisition may be substantially to lessen competition in several markets. See Texaco Inc. and Getty Oil Co.; Proposed Consent Agreement With Analysis To Aid Public Comment, 49 Fed.Reg. 8550, 8556 (March 7, 1984). Specifically, the draft complaint noted that "[c]ontrol by Texaco of Getty's marketing operations is likely to reduce price competition in gasoline and middle distillate marketing provided by Getty...." Id.
 
 
 9
 However, rather than enjoin the entire merger, the Commission proposed specific remedial action to alleviate its particular concerns. Among the proposed remedies, which were embodied in a consent order, was one which called for Texaco not only to divest Getty's wholesale gasoline terminals in six specific Northeast and Mid-Atlantic markets but also the Getty retail stations served by the terminals to be divested. In this way, the FTC sought to maintain competition at the wholesale level by guaranteeing that the divested assets would continue to be part of "an ongoing, viable petroleum marketing business." Id. at 8551. The FTC analysis which accompanied the proposed order made clear that the Commission would not rubber stamp any prior agreement between Texaco and Power Test, that the contemplated transaction would not be permitted without Commission approval, and that FTC scrutiny would be forthcoming only after Texaco had first committed itself to a final divestiture order.[1] FTC Analysis, 49 Fed.Reg. at 8559 (emphasis added).
 
 
 10
 After a period for considering public comments, a final consent order was entered into on July 9, 1984. That order required Texaco to divest absolutely and in good faith certain Getty assets, including the Getty franchises at issue herein and the "Getty" brand name and trademark. The provision requiring Texaco to divest the "Getty" name and mark was included at the sole insistence of the FTC and was not a subject of negotiation between Texaco and the FTC. Moreover, the FTC required that any potential purchaser first be approved by the Commission. Finally, on January 17, 1985, after consideration of public comments and other information, the FTC approved Texaco's divestiture of certain Getty gasoline station assets, supply contracts, franchise agreements, and the "Getty" name and mark to Power Test.
 
 
 11
 Shortly thereafter, in a letter dated March 4, 1985, Texaco notified each of the Getty dealers whose station properties were being divested to Power Test that their franchise relationships would be terminated pursuant to the provision of the PMPA which provides for termination of franchises when reasonable, 15 U.S.C. Sec. 2802(b)(2)(C).[2] Appellants are former Getty franchisees whose franchises were divested by Texaco to Power Test. They brought suit alleging that their franchises were terminated in violation of the Act.[3] Finding that no violation of the Act had occurred, the district court granted appellees' motions for summary judgment, denied appellants' cross-motion for summary judgment, and entered a judgment dismissing the claims under the Act. This appeal followed.
 
 DISCUSSION
 
 12
 Congress enacted the PMPA to establish " 'protection for franchisees from arbitrary or discriminatory termination ... of their franchises.' " Bellmore v. Mobil Oil Corp., 783 F.2d 300, 304 (2d Cir.1986) (quoting S.Rep. No. 731, 95th Cong., 2d Sess. 15, [hereinafter cited as "Senate Report"], reprinted in 1978 U.S.Code Cong. & Ad.News 873, 874). At the same time however, Congress was aware of the need to protect a franchisor's ability to terminate a franchise because of a change in circumstances. Specifically, the legislative history of the Act reveals that Congress recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." Senate Report at 19, reprinted in 1978 U.S.Code Cong. & Ad.News 873, 877. The statutory scheme of the Act reflects these concerns.
 
 The Statutory Scheme
 
 13
 Section 2802(b)(1)(B) prohibits termination of any franchise relationship unless the franchisor can show that such termination is based upon a ground described in Sec. 2802(b)(2). Section 2802(b)(2) describes several grounds for lawful termination of a franchise. The provision relied upon by Texaco in terminating the Getty franchises is Sec. 2802(b)(2)(C) which states that termination is permissible if based upon:
 
 
 14
 The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable.
 
 
 15
 15 U.S.C. Sec. 2802(b)(2)(C) (emphasis added).
 
 
 16
 Section 2802(c) enumerates twelve specific events which are deemed to be "relevant to the franchise relationship ... as a result of which termination of the franchise is ... reasonable" within the meaning of Sec. 2802(b)(2)(C). Thus, if an event falls within the enumerated list, termination is conclusively presumed to be reasonable as a matter of law. Once having ascertained that an event is encompassed by one of the twelve enumerated events, a court need make no further inquiry as to the reasonableness of the termination. Lugar v. Texaco, Inc., 755 F.2d 53, 59 (3d Cir.1985).
 
 
 17
 However, although, as discussed below, we need not reach this issue, it is clear from the language of the PMPA that the list of events set forth in Sec. 2802(c) was meant to be only illustrative, not exclusive. The statutory language states that Sec. 2802(b)(2)(C) "includes events such as " those enumerated. 15 U.S.C. Sec. 2802(c) (emphasis added). This conclusion is made explicit in the legislative history of the Act. "[A] judicial determination may be made that an event, other than one enumerated in this list, or an event similar but not identical to one enumerated in the list, constitutes an event which is relevant to the franchise relationship as a result of which termination or nonrenewal is reasonable." Senate Report at 38, reprinted in 1978 U.S.Code Cong. & Ad.News at 896. In other words, events not foreseen or identified by Congress and hence not listed in Sec. 2802(c), may still satisfy the statutory standards of Sec. 2802(b)(2)(C). See Moody v. Amoco Oil Co., 734 F.2d 1200 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); Hifai v. Shell Oil Co., 704 F.2d 1425, 1429-30 (9th Cir.1983).
 
 
 18
 Texaco, in its notice of termination, specifically noted one of the events enumerated in Sec. 2802(c). Section 2802(c)(6) includes as a ground for lawful termination:
 
 
 19
 loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise....
 
 
 20
 We must determine whether, under the circumstances presented in this case, Texaco's divestment of the "Getty" brand name and trademark pursuant to FTC order falls within this provision. If it does, the reasonableness of Texaco's termination would be presumed and our inquiry would be at an end. See Brown v. American Petrofina Marketing, Inc., 555 F.Supp. 1327, 1335-36 (M.D.Fla.1983), aff'd mem., 733 F.2d 906 (11th Cir.1984) (loss of trademark alone is sufficient ground for termination). We conclude, for the reasons stated below, that Texaco's divestment of the "Getty" trademark comes within Sec. 2802(c)(6) thereby making termination of appellants' franchises lawful. We do not decide whether, absent the trademark divestment, Texaco's divestment of the Getty assets under the circumstances of this case would be deemed to be reasonable under Sec. 2802(b)(2)(C).Loss of Right to Grant Trademark
 
 
 21
 Appellants present two discrete issues of statutory construction in support of their claim that Texaco was not entitled to terminate their franchises under the Act.[4] First, they contend that the reference in Sec. 2802(b)(2)(C) to an "event" which is relevant to the franchise relationship as a result of which termination is reasonable does not include a "sale." Second, they argue that the word "loss" in Sec. 2802(c)(6) implies an involuntary loss of the right to grant the right to use a trademark and that Texaco's divestment of the "Getty" trademark was voluntary. Having considered appellants' contentions, we reject each of them.
 
 
 22
 As a preliminary matter, appellants urge that Sec. 2802(b)(2)(C) should not apply at all to Texaco's sale of the Getty marketing assets, including the trademark, because that section is limited to "events." Appellants argue that a "sale" is not an "event" within the meaning of Sec. 2802(b)(2)(C) because sales are dealt with specifically and exclusively in another subsection, namely, Sec. 2802(b)(2)(E). In appellants' words, "[t]he only instance where a sale of a station can be a ground for termination is if the franchisor is withdrawing from the entire market area." We reject this argument for two reasons.
 
 
 23
 First, in its letter of termination, see supra note 2, Texaco specifically listed its transfer of the "Getty" brand name and trademark to Power Test as a ground which justified termination of the Getty franchises. In Sec. 2802(c)(6), a franchisor's loss of trademark, without more, is defined as an "event" sufficient to satisfy Sec. 2802(b)(2)(C). Thus, we need not decide whether a "sale" of franchises may also be an "event" which would satisfy Sec. 2802(b)(2)(C) if judicially determined to be a reasonable ground for termination. In other words, the "event" which we hold to be relevant to the franchise relationship and as a result of which termination is reasonable is Texaco's transfer of the "Getty" name and mark, not its sale of marketing assets.
 
 
 24
 Second, we disagree with appellants' contention that Sec. 2802(b)(2)(E) is the sole provision governing sales of franchised premises as a permissible ground for termination. Reading the statute as a whole, it is apparent that that section was meant to deal only with the limited situation where a franchisor is withdrawing entirely from the market area. Section 2802(b)(2) provides five grounds that are valid bases for termination of a franchise. The last of these, Sec. 2802(b)(2)(E), gives the franchisee certain rights in a narrowly drawn situation. Where the franchisor decides to withdraw from the relevant geographic market, in the case of leased marketing premises, a franchisee must be afforded the right to purchase the franchisor's interest in the premises. We do not believe that because the Act, in Sec. 2802(b)(2)(E), specifically permits terminations occasioned by sales pursuant to such market withdrawals, Congress intended that under no other circumstances could a sale of the franchised premises ever constitute a permissible ground for termination, even if it otherwise qualified as an event satisfying the statutory standards of Sec. 2802(b)(2)(C).
 
 
 25
 This conclusion is reinforced by referring to the purposes for which the PMPA was enacted. As the Seventh Circuit has stated:
 
 
 26
 Congress, in enacting the PMPA, sought to protect franchisees from arbitrary terminations ... while allowing franchisors to exercise reasonable business judgment. Section 2802(b)(2)(C) helps maintain that balance by allowing termination for unforeseen but reasonable grounds.
 
 
 27
 Moody, 734 F.2d at 1217. To conclude, as appellants argue, that a "sale" cannot be an "event" within the meaning of Sec. 2802(b)(2)(C) for purposes of termination because another section of the statute applies to a limited category of sales (upon market withdrawal) would be inconsistent with Congress' intent to provide franchisors with "adequate flexibility ... to respond to changing market conditions and consumer preferences." Senate Report at 19, reprinted in 1978 U.S.Code Cong. & Ad.News at 877.
 
 
 28
 Appellants also contend that Texaco's divestiture of the "Getty" trademark does not fit squarely within Sec. 2802(c)(6) which requires "loss of the franchisor's right to grant the right to use the trademark which is subject to the franchise" and therefore that it cannot serve as a ground for termination. Appellants argue that the word "loss" connotes an occurrence of an involuntary nature and that Texaco's divestiture of the "Getty" mark was in fact voluntary. Specifically, appellants claim that Texaco voluntarily acquired Getty, that it entered into a sales agreement with Power Test prior to the time that it entered into the FTC consent order, and that in the consent agreement, it agreed to do only what it had previously undertaken in its private agreement with Power Test. We reject these arguments on two grounds.
 
 
 29
 First, we agree with Judge Weinstein that the word "loss" as used in Sec. 2802(c) is intended to cover voluntary as well as involuntary situations. In reaching this conclusion we draw upon the legislative history of the PMPA as well as cases from other circuits that have interpreted the PMPA. The term "loss" appears twice in the list of the twelve enumerated events of Sec. 2802(c) which satisfy Sec. 2802(b)(2)(C) as a matter of law. Although the legislative history of the Act does not explain the meaning of the expression "loss" with reference to Sec. 2802(c)(6) (loss of trademark), it does explain the term as used in the context of Sec. 2802(c)(4) (loss of underlying lease). The Senate Report makes clear that where a franchisor's voluntary decision not to renew an underlying lease results in the "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease," termination is nevertheless reasonable under Sec. 2802(b)(2)(C). Senate Report at 38, reprinted in 1978 U.S.Code Cong. & Ad.News at 896 ("Expiration of the underlying lease could occur under a variety of circumstances including, for example, a decision by the franchisor not to exercise an option to renew the underlying lease"). Other circuits interpreting Sec. 2802(c)(4) have similarly construed "loss" to include a voluntary loss. See Lugar, 755 F.2d at 56 (franchisor declined to assign to franchisee an option to purchase premises upon expiration of lease); Veracka v. Shell Oil Co., 655 F.2d 445, 448 (1st Cir.1981) (franchisor refused to extend lease that would otherwise have renewed automatically).
 
 
 30
 Contrary to appellants' assertion that the loss of the underlying lease situation is somehow special, we perceive of no reason to construe Sec. 2802(c)(6) differently from Sec. 2802(c)(4). As we have said in United States v. Nunez, "[i]t is a settled principle of statutory construction that '[w]hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.' " 573 F.2d 769, 771 (2d Cir.), cert. denied, 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978) (quoting Meyer v. United States, 175 F.2d 45, 47 (2d Cir.1949)). Thus, construing the meaning of "loss" in Sec. 2802(c)(6), in pari materia with its meaning in Sec. 2802(c)(4), we conclude that Texaco's loss of the "Getty" trademark need not be involuntary to fall within the parameters of Sec. 2802(b)(2)(C).
 
 
 31
 Second, notwithstanding whether Sec. 2802(c)(6) covers the voluntary loss of trademark rights, we deem Texaco's divestiture of the "Getty" trademark herein to be involuntary. In the original Memorandum of Agreement relating to the disposition of the Getty Northeast marketing assets, Texaco did not agree to divest the "Getty" trademark to Power Test, but rather to "grant[ ] Power Test the exclusive license to use the name and mark 'Getty.' " In other words, under its private agreement with Power Test, Texaco did not agree to divest the ownership of the "Getty" trademark and trade name. However, the FTC insisted that Texaco accede to an FTC order which required it to "divest absolutely" the "Getty" trademark. Thus, where the absolute divestiture of the "Getty" trademark was found by the district court to have been "ultimately imposed by the final FTC Order," 630 F.Supp. at 689, any requirement of involuntariness is clearly established.
 
 
 32
 Having shown that Texaco's loss of the "Getty" trademark resulting from the FTC's divestiture order falls squarely within Sec. 2802(c)(6), the reasonableness of Texaco's termination under Sec. 2802(b)(2)(C) is conclusively established without more. The judgment of the district court dismissing appellants' PMPA claims is affirmed.
 
 
 
 *
 Honorable Dudley B. Bonsal, Senior Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The language of the FTC Analysis reads as follows:
 The proposed consent requires prior Commission approval of any acquirer, including Power Test. The Commission has not granted any such approval. If the proposed order is accepted finally, the Commission will decide whether to approve proposed acquirer(s) following a review of written comments submitted by interested persons during [a] separate, 30-day public comment period....
 Texaco Inc. and Getty Oil Co.; Proposed Consent Agreement With Analysis To Aid Public Comment, 49 Fed.Reg. 8550, 8559 (March 7, 1984).
 
 
 [2]
 The notice sent by Texaco to the Getty franchisees reads in pertinent part as follows:
 On January 17, 1985, the Federal Trade Commission approved the sale of the various assets by Getty and/or Texaco Inc. to Power Test Corporation (which sale of assets was completed on February 1, 1985). At such closing Getty assigned to Power Test Corporation all of Getty's interest in each of the contracts, leases or other agreements which Getty at that time had with you. In addition, on January 17, 1985, the Federal Trade Commission approved the transfer and assignment of the Getty trademark to Power Test Corporation which transfer is scheduled to take effect on July 11, 1985.
 The occurrence of these events makes the termination of your franchises reasonable under 15 U.S.C. Section 2802(b)(2)(C) of the Petroleum Marketing Practices Act....
 Texaco letter to Getty franchisees, dated March 4, 1985, quoted in Russo v. Texaco, Inc., 630 F.Supp. 682, 686 (E.D.N.Y.1986) (emphasis added).
 
 
 [3]
 Power Test is a distributor, not a refiner, and therefore is not subject to the provisions of the PMPA. Although Power Test undertook contractually all the duties imposed by the Act in order to alleviate FTC concerns, appellants, who are now leasing their service stations subject to franchise agreements, are seeking the opportunity to purchase such stations outright as mandated by the Act in certain situations where a franchisor sells its franchises. See 15 U.S.C. Secs. 2802(b)(2)(E) and (b)(3)(D)
 
 
 [4]
 Appellants also argue, based on testimony given at legislative hearings, that Sec. 2802(c)(6) was intended to apply only when a jobber or distributor, rather than a refiner such as Texaco, loses the right to use a trademark. This argument too must fail. The statute expressly refers to "loss of the franchisor's right." 15 U.S.C. Sec. 2802(c)(6) (emphasis added). Franchisor is defined to include "a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. Sec. 2801(3) (emphasis added)