**SHELL OIL COMPANY, Plaintiff,**

v.

**HILLARY FARMER SERVICE
STATION, INC., Defendant.**

No. 89 C 3333.

United States District Court,
E.D. New York.

June 1, 1990.

James L. Michalak, Houston, Tex., for plaintiff.

Arnold P. Azarow, Westbury, N.Y., for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Shell Oil Company (Shell) brought this action against defendant Hillary Farmer Service Station, Inc. (the Station), seeking, among other things, a declaration that the franchise agreement between the parties has been properly terminated and an injunction requiring the Station to return to Shell all its fixtures and personal property. The complaint asserts jurisdiction based on diversity (28 U.S.C. § 1332), and federal question jurisdiction (28 U.S.C. §§ 1331, 1337).

By Memorandum and Order dated December 7, 1989, familiarity with which is assumed, this court issued a preliminary injunction requiring the Station to return Shell's trademark identifications, signs, and other advertising devices. Shell now moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P., declaring the franchise agreement terminated, or, in the alternative, summary judgment adjudicating specific facts.

The critical facts are for the most part not in dispute. In July 1988, Shell and the Station entered into a franchise Dealer Agreement (the Agreement) dated May 1, 1988. Shell was to provide the Station with a petroleum marketing franchise, supplying trademark identifications, signs, advertising devices, motor fuel, and other petroleum products from May 1988 until April 30, 1991.

On September 14, 1989, the Station was damaged by a fire which started in the repair bays and spread to the attached office. The Station contends that no structural damage was done to the building. Photographs show the building still to be standing, but there were signs of fire on the roof and brick work, and considerable fire damage to the interior, including the repair bays, sales office and lavatories.

On October 5, 1989, citing the terms of the Agreement, Shell purported to terminate the franchise, explaining that the Station had been destroyed in "substantial part" by the fire, the Station had failed to comply with New York environmental regulations requiring service stations to install by July 1, 1989 a Stage II Vapor Recovery System to protect surrounding property from fuel seeping from the gasoline storage tanks, and the Station had been closed for over seven days.

After the Station refused to return the trademark identifications, signs and other advertising devices, Shell moved to compel the return of these items. The Station cross-moved for an order declaring that (1) Shell, by terminating the Agreement, had violated the restrictions on termination imposed by the Petroleum Marketing Practices Act (the Act), 15 U.S.C. § 2805(a), protecting motor fuel franchisees from, among other things, arbitrary termination; (2) the franchise was still in force; and (3) Shell was required to continue to supply fuel and related products.

As noted above, the court granted Shell's motion, requiring the Station to return the advertising items. The court denied the Station's cross-motion.

## I

The court may grant summary judgment under Rule 56(c), Fed.R.Civ.P., only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the lack of a genuine issue of fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). All reasonable inferences must be drawn in favor of the non-movant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Section 18.1 of the Agreement provides that "[s]ubject to any limitations imposed by law," Shell may terminate the Agreement upon notice (or advance notice if required by law) for, among other reasons,

"knowing failure of Dealer to comply with federal, state, or local laws or regulations relevant to the operation of Dealer's Station" and "destruction (other than by Shell) of all or a substantial part of the Dealer's Station."

The Petroleum Marketing Practices Act (the Act), 15 U.S.C. §§ 2801–2806, one of the "limitations imposed by law," prohibits a franchisor engaged in the selling or distributing of motor fuel from terminating a franchise agreement before its expiration unless the particular requirements outlined by the Act have first been met. *See* 15 U.S.C. §§ 2802(a), (b).

Under 15 U.S.C. § 2802(b)(1) the franchisor may not terminate the franchise unless the notification requirements of section 2804 are met and the termination is based upon a ground described in subparagraph (2) of § 2802(b). That subparagraph provides that, among other "grounds for termination of a franchise," is the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise" is "reasonable," if "such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence" "not more than 60 days prior to the date on which notification of termination is given, if less than 90 days notification is given." 15 U.S.C. § 2802(b)(2)(C).

Section 2802(c) defines such an "event" making termination of the franchise "reasonable" to include, among twelve such events, "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises" and "destruction (other than by the franchisor) or all or a substantial part of the marketing premises." If any of the twelve events is found to exist, the termination is "conclusively presumed to be reasonable as a matter of law." *Russo v. Texaco, Inc.*, 808 F.2d 221, 225 (2d Cir.1986).

The court will first address whether Shell had grounds for termination and then whether it provided notice, as required by the Act.

### A. *Grounds for Termination under the Act*

#### i) Failure to Comply with Environmental Regulations

The regulations of the New York State Department of Environmental Conservation (the State Department) provide, in pertinent part, that no "owner" or "operator" of a gasoline-dispensing site may allow the transfer of gasoline into a tank at gasoline-dispensing sites in the New York City metropolitan area whose annual "throughput" exceeds 250,000 gallons, "unless the gasoline-dispensing site is equipped with a Stage II vapor collection system." N.Y. Comp.Codes R. & Regs. tit. 6 § 230.2(c) (1985); 6 N.Y.C.R.R. § 230.2(c) (1985).

The affidavits submitted establish plainly that the Station is an "owner" and an "operator" within the meaning of the regulations, N.Y.Comp.Codes R. & Regs. tit. 6, 200.1(oo) and (qq) (1984); 6 N.Y.C.R.R. §§ 200.1(oo) and (qq) (1984), and had an annual throughput of gasoline exceeding 250,000 gallons. *Id.* tit. 6, § 230.1(b)(5) (1985); 6 N.Y.C.R.R. § 230.1(b)(5) (1985).

The regulations required installation of such Stage II vapor collection systems as of July 1, 1989 at sites whose annual throughput was between 250,000 and 500,000 gallons. The Station was such a site, was required to comply with these regulations, knew of their existence, and had failed to comply as of October 5, 1989 when Shell gave notice of termination.

On October 17, 1989 the State Department conducted an investigation and determined that the Station continued to dispense gasoline though it had not complied by the deadline provided in the regulations.

The State Department did not condone these violations. It required the Station to make a "penalty payment" of $600, to take affirmative steps "to resolve the continued violation," and to install the Stage II system and obtain a certificate to operate by January 31, 1990. The Station consented to an order embodying these provisions. The order also recited that the "continued act of dispensing gasoline at stations not equipped and operated in accord with a valid Certificate to Operate subjects the Respondent [the Station] to continued liability for civil and criminal penalties" but that the State Department "will not institute further enforcement so long as the Respondent obeys and complies with the terms of this Order."

■ The Station contends that it should not be deemed to have violated the regulations. It reasons that it had not received a citation from the State Department, Shell did not previously voice a complaint, and the later State Department order directing compliance extended the time for doing so. This argument has no merit.

The recitals in the order establish that the Station did not have the requisite equipment in place but had continued to dispense gasoline on July 1, 1989 and thereafter and that the Station agreed to take steps to resolve "the continued violation." The "penalty" payment of $600 was for the past violation. That Shell made no earlier complaint and that the State Department issued no previous citation are irrelevant.

■ The Station argues that the term "knowing failure" in the Act should be construed to mean some kind of "intentional disregard" or "plain indifference," and that it was "reasonable" for the Station not to comply. There is no warrant in the language of the Act for reading the words "knowing failure" in any peculiar sense. The Station admitted in its papers in this court that it knew that the Stage II system had to be installed on or before July 1, 1989. In fact it admitted that it had plans drawn for such installation in June 1989.

The regulations leave no room for a "reasonable" failure to comply. They unequivocally made it a violation as of July 1, 1989 for the Station to dispense gasoline while the premises were not equipped with the Stage II system.

The Station suggests, but submits no evidence to show, that the failure to comply with the regulation was beyond its control. Even if the Station had offered evidence that, for example, it could not obtain a contractor to install the required control system by July 1, 1989, that would not

excuse the Station from the regulation's prohibition against dispensing gasoline without such a system. It was not beyond the Station's ability to cease dispensing gas until it had installed the requisite equipment or received permission from the State Department to postpone the installation. The Station also contends that Shell is "estopped" from terminating the franchise for failure to comply with the regulations because Shell, which allegedly had "constructive knowledge" of the absence of Stage II controls, never complained about this earlier and gave the Station an opportunity to cure. This kind of contention was rejected in *Wisser Company, Inc. v. Mobil Oil Corporation*, 730 F.2d 54, 58 (2d Cir.1984).

In any event, there is a public interest in requiring compliance with the regulations of gasoline stations. Many of them, perhaps most, concern matters of safety and the environment. Yet government is notoriously shorthanded in its efforts to enforce such regulations. It would ill serve the public weal to adopt a rule which would tend to discourage the franchisor from requiring the franchisee to comply.

Finally, because defendant acknowledges that Shell did not have actual or constructive notice of its noncompliance with the regulations until after the fire in September and, in any case, because each separate violation of the regulations took place every day from July 1, 1989 up to the time of the fire damage on September 14, 1989, Shell gave notification of termination to the defendant within 60 days of it acquiring knowledge of the occurrence of the "event" upon which termination was based, as required by 15 U.S.C. § 2802(b)(2)(C)(ii). Termination based on defendant's failure to comply with State Department environmental regulations was "reasonable" under § 2802(b)(2)(C) of the Act.

ii) "Substantial" Destruction of the Marketing Premises

■ Shell has demonstrated, and defendant does not dispute, that there was destruction of a considerable part of the Dealer's station. The question is whether the part destroyed is a "substantial part" of the "marketing premises." 15 U.S.C. § 2802(c)(7).

This turns not so much on the seriousness of the damage, which was admittedly great, as on the function the damaged areas played in the operation and marketing of the Station. The Act defines the "marketing premises" as "in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel." The Station argues that the "marketing premises" should include only the fuel pumps and fuel storage tanks that escaped the fire allegedly unscathed. However, "premises" is generally defined as "building together with its grounds or other appurtenances." *Random House Dictionary of the English Language* (Unabridged Edition) 1136 (1967). While "marketing" premises limits the building and grounds to those used "in connection to the sale" of motor fuel, it would be fatuous to suppose the term does not include the sales office of those stations that had an office.

■ The evident purpose of the franchise arrangement is to preserve and continue the consuming motoring public's confidence in and acceptance of the franchisor's products to the benefit of the consumers, and consequently to the economic benefit of the franchisor and franchisee. Thus if the extent and nature of the damage to the Station is sufficiently serious as significantly to undermine the motoring public's confidence in and acceptance of Shell products the destruction is reasonably considered "substantial."

Relevant to this determination are such factors as (1) the ability to provide full and effective service despite the damage; (2) the length of time it would take to repair the damage; (3) the exterior appearance of the station; and (4) the appearance of other facilities or building used by the public.

Photographs of the Station taken several days after the accident show the brickwork marred with soot, the window frames discolored, and the paint singed away. Sections of the roofing above the repair bays and the sales office are burned through.

The appraisal of the damage submitted by the Station shows that the aluminum shingle mansard cover, the soffit under the mansard and the trough box for lighting, and certain roof boards need replacement. The Station plainly had suffered a fire and hardly presented the facade of a well run business.

The interior of the sales office, lavatories, and repair bays show far greater evidence of fire. Shell argues that the repair bays should be considered in determining the severity and the extent of the damage done. The Station contends, however, that Shell had by September 1, 1989, before the fire, consented to allow the Station to operate for "gas only," and that thus the public would not expect to use the repair bays. The court accepts the Station's assertion as true for purposes of the motion.

The photographs of the interior of the sales office show it is completely destroyed by fire. Defendant admits there was heat, smoke, and water damage. In fact, the heat was so great that it melted the Point of Sale computer where sales are recorded. The appraisal shows that portions of the sheet rock ceiling, parts of the plaster walls, the wood entry door and transom, metal sills, head jambs and division bars, plateglass windows, transom plateglass, and the roll down security gate required replacement.

In addition, work was required to repair and clean the quarry tile floor and repair or replace wiring and fixtures. The entire room required painting. The same work needed to be done on the two lavatories. In short, the sales office and the lavatories were unusable to the motoring public.

The Station urges that the office was not necessary for the sale of gasoline. The pumps and the underground storage tanks were unharmed by the fire. The Station thus contends that damage to the office should not be considered in evaluating the substantiality of the destruction to the Station. To accept this argument would be to ignore the effect of the destruction on the public's perception of the Station. Closing the security doors does not hide evidence of fire damage; the exterior clearly shows the tell-tale signs.

Even if security doors could be pulled down so as to hide the fire's damage, the immediate impression created on motorists would be that of a closed station or one providing limited services. The impact on Shell's standing and trademark is obvious.

Even if, as the Station contends, the fuel pumps are still working and customers can still be serviced, it is hard to see how full and effective service could be offered absent the standard sales office. Even those stations with smaller kiosks rather than buildings with sales offices require some structure to hold the cash register and facilitate the processing of credit card sales.

A significant factor in determining whether the "destruction" was "substantial" is the time required to return the Station to full working order. Had the Station been able to repair the station within a week—the maximum time period provided by the Act that a station could remain closed without raising the possibility of termination, 15 U.S.C. § 2802(c)(9)—the destruction might not have been so serious as to be "substantial."

There is no evidence that repairs could have been made nearly that quickly. The appraisers did not conduct their appraisal until October 5, 1989, over three weeks after the fire, and Hillary Farmer, Jr., the owner of the Station, admitted at his deposition that the interior of the station was not in "working condition" until the end of October, or the early part of November, over six weeks after the fire.

Because of the clear negative impression left by the damage incurred, furthered by the length of time required to repair, the court holds as a matter of law that the Station was destroyed in "substantial part."

Shell gave notification of termination to the defendant within 60 days of its acquisition of knowledge of the occurrence of the "event" upon which termination was based, as required by 15 U.S.C. § 2802(b)(2)(C)(ii). Thus, termination based on destruction of a substantial part of the marketing premises

was "reasonable" under § 2802(b)(2)(C) of the Act.

B. *Notice Requirement under The Act*

As noted above, a prerequisite of a valid termination by the franchisor is that it comply with the "notification requirements" of 15 U.S.C. § 2804. That section in subparagraphs (a) and (b) provides, so far as pertinent here, that the franchisor shall furnish notification of termination "not less than 90 days prior to the date" of termination, except in "circumstances in which it would not be reasonable for the franchisor to furnish" such 90 days notification. In that event the "franchisor shall furnish notification" on "the earliest date on which furnishing such notification is reasonably practicable." 15 U.S.C. § 2804(b)(1)(A).

Shell did not give 90 days notice, but argues that the notice it gave four weeks after the fire was "reasonable."

Because the Station was operating in violation of the environmental regulations, Shell waited four weeks from the time the fire occurred, the Station had yet to make repairs, and the basis for termination was clear, Shell acted in good faith, and it was "reasonable" as a matter of law to give accelerated notice for the violation of the environmental regulations and substantial destruction. *Cf. Smoot v. Mobil Oil Corp.,* 722 F.Supp. 849, 855 (D.Mass.1989) (accelerated notice permissible for failure to sell gasoline). In addition, Shell gave notice at the earliest date that was "reasonably practicable."

Shell's complied with the requirements of the Act and is thus not prevented by the Act from terminating its agreement.

## II.  TERMINATION UNDER THE AGREEMENT

Although the Act poses no bar to termination, the Station urges that section 5 of the Agreement, providing for a 60–day grace period for terminations caused by the franchisee's failure to "maintain a suitable place of business" by not using an "architectural design, style, color scheme and layout acceptable to and approved by Shell

as being in accordance with Shell's customary motor fuel station standards and specifications" prohibits termination on the basis of substantial destruction. That provision has no application here.

Shell did not terminate the franchise for the Station's failure to do maintenance on the premises. Shell terminated under the specific termination provision of the Agreement for substantial destruction. The 60–day grace period is inapplicable.

The Station also claims that section 16 of the Agreement, titled "Excuses For Non–Performance," which excuses performance so long as performance is "delayed or prevented ... by fire" prohibits Shell from terminating the Agreement. That clause is inapplicable. It might protect Shell or the Station from suit by the other for breach of contract for failure to supply or sell motor fuel during the period the Station was damaged, but has no effect on the contract's separate termination provisions.

The Station finally argues that the damage caused by the fire was beyond its reasonable control, and thus termination was not proper. There is nothing in the Act limiting termination based on substantial destruction only to those circumstances when the franchisee caused the substantial damage. The Act provides that some events giving grounds for termination may be excused if "beyond the reasonable control of the franchisee." 15 U.S.C. §§ 2802(c)(8), 2802(c)(9), 2802(c)(11). But the event of termination for substantial destruction is not one of them.

The franchisee and franchisor could contract to offer the franchisee greater protections than is offered by the Act. They have not done so with regard to the grounds at issue in this action. For the reasons termination is permissible under the Act, it is justified under the section 18.1 of the Agreement, previously discussed.

## III.  CONCLUSION

Shell's termination of the franchise was proper under the Act and the Agreement

on the grounds that (1) the Station knowingly failed to comply with the State Department's regulations, and (2) destruction of a substantial part of the Station and its marketing premises. Shell's motion for permanent injunction is granted to include the provisions contained in the preliminary injunction requiring the station to return Shell's trademark, identifications, signs, and other advertising devices.

So ordered.