Charles R. FINK, John C. Resetar, Anthony Mazzarini, Jr., John Mauro, David Mauro, Michael Meyer, Edward Pletz, Henry E. Szewczyk, Mark H. Szewczyk, Harvey Stickler, Peggy A. Cotugno, Timothy B. Shell, Mark Marshall, and Edwin A. Marshall, Plaintiffs,

v.

AMOCO CORPORATION, an Indiana corporation, Amoco Oil Company, a Maryland Corporation, British Petroleum Company, p.l.c., a foreign corporation, and BP Amoco Corporation, an Indiana corporation, Defendants.

No. Civ.A. 99–716.

United States District Court, W.D. Pennsylvania.

June 14, 1999.

Richard DiSalle, Pittsburgh, PA, for plaintiffs.

Arthur J. Schwab, J. Andrew Langan, Robert L. Stout, Jr., Pittsburgh, PA, for defendants.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

ZIEGLER, Chief Judge.

1. This is a civil action for money damages and equitable relief based on the Petroleum Marketing Practices Act. 15 U.S.C. § 2801, et seq. The complaint also includes state law claims for breach of contract and promissory estoppel. Plaintiffs have filed motions for a temporary restraining order and a preliminary injunction based on the PMPA, and therefore we need not address the question of preemption of the state law claims within the context of this proceeding.

2. Plaintiffs are 14 individual residents of this district, who are branded lessee retail gasoline service station dealers and operators in the Pittsburgh metropolitan area, including the counties of Allegheny, Butler, Beaver, Fayette, Westmoreland and Washington. Plaintiffs lease their stations from Amoco Corporation and/or Amoco Oil Company, which are now BP Amoco Corporation, as a result of a merger between Amoco Corporation and British Petroleum Company, on or about August 11, 1998. Plaintiffs have operated retail gasoline service stations for many years for Amoco Oil Company, pursuant to various contracts and leases between plaintiffs and Amoco Corporation, Amoco Oil Company and, after the merger, with BP Amoco Corporation. For example, Anthony Mazzarini testified that his father operated an Amoco retail service station beginning in 1949, and that he was raised in the business. He currently operates two Amoco retail franchise gasoline dealerships in Allegheny County. Mr. Mazzarini borrowed $125,000 and paid for goodwill to the prior lessee in 1992, and signed a lease for the Amoco retail station at the corner of Conner and Washington Roads, Mt. Lebanon, Pennsylvania, where he currently operates under a three-year lease with Amoco. He also paid $40,000 in goodwill for a second Amoco retail franchise on Cochran Road in Mt. Lebanon in 1998. Over the years, Mr. Mazzarini has spent additional sums exceeding $100,000 to improve the appearance and operation of the two stations.

3. Charles Fink testified that he has been an Amoco retail dealer for 27.5 years, and that he operates three retail service stations leased from Amoco Oil Company, in Homestead, Bethel Park and Fox Chapel, Pennsylvania. Mr. Fink paid $25,000 for the Homestead franchise; $240,000 for the Bethel Park lease; and $85,000 for the Fox Chapel dealership. In each instance, Amoco Oil Company is the owner and lessor of the real estate, and a copy of the lease agreement with this plaintiff is attached to the complaint as Exhibit A. The lease for the Homestead site is dated August 14, 1998, and will expire on October 31, 2001. Prior to the merger, Mr. Fink

was offered $1.7 million dollars from a third party for the three leasehold interests.

4. Until December 31, 1998, The British Petroleum Company, p.l.c., was a British Company with its principle place of business in London. Effective December 31, 1998, British Petroleum became known as BP Amoco, p.l.c. Defendant, BP Amoco, p.l.c. is a corporation organized under the laws of England and with its principal place of business in London. BP Amoco, p.l.c., has been voluntarily dismissed by plaintiffs, without prejudice. Defendant, BP Amoco is a corporation organized under the laws of the state of Indiana, and with its principal place of business at Chicago, Illinois. BP Amoco Corporation was formerly known as the Amoco Corporation until the merger with the British Petroleum Company, on August 11, 1998, and the name was changed on December 31, 1998. As a result of the merger, BP Amoco Corporation has a combined market capitalization of over $140 billion.

5. Amoco Oil Company is a corporation organized under the laws of the state of Maryland, and with its principal place of business at Chicago, Illinois.

6. Amoco Oil Company is engaged in selling gasoline petroleum products to independent retail service station dealers, who operate service stations in many states. The independent retail dealers of Amoco Oil Company, such as plaintiffs, resell Amoco branded products to the motoring public.

7. Amoco Oil retail service station dealers, such as plaintiffs, are independent business operators and are not permitted to sell other branded products under the Amoco trademarks. The independent dealers hire their own employees, and operate their own businesses.

8. Amoco Oil Company also markets motor fuel through stations operated by independent "open dealers" who own or lease their own station properties and purchase Amoco branded products for sale to customers. Finally, Amoco Oil Company also markets gasoline and other Amoco products to the public through direct company owned stations.

9. Jurisdiction is based on 28 U.S.C. § 1331, and the Petroleum Marketing Practice Act. 15 U.S.C. § 2805. Jurisdiction is also based on 28 U.S.C. § 1332, and venue is appropriate under 28 U.S.C. § 1391, and 15 U.S.C. § 2805.

10. On or about February 26, 1999, BP Amoco notified each plaintiff that Amoco was terminating the franchise relationship at the various retail service stations effective May 28, 1999, or "the date upon which Amoco closes on the sale of the assets to a purchaser. approved by the FTC." BP Amoco also advised in writing that the leases and franchise relationship at the service stations were terminated and not-renewed because "an event has occurred which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." Plaintiffs were notified to conclude their business affairs and relinquish possession of the premises by the effective date of the termination.

11. Plaintiffs responded with the instant complaint and motions contending that defendants have violated section 2802 of the PMPA by unlawfully terminating plaintiffs' franchises, leases and related contracts, and that this court should enjoin defendants from terminating the franchise agreements and related contracts; order defendants to sell the leased premises to plaintiffs; or give plaintiffs the right of first refusal to purchase the leased premises, and award money damages to plaintiffs.

12. We begin by noting that Congress enacted the Petroleum Marketing Practices Act in 1978 to protect "franchisers from arbitrary or discriminatory termination or nonrenewal of their franchises." S.Rep. No. 95–731 at 15, reprinted in U.S.C.C.A.N. 873–74 (1978). Congress noted that the relationship between the

petroleum industry and the franchisees is often characterized by competing interests. Id. at 875. Congress enacted the PMPA to address the use of termination, or the threat thereof, to compel compliance with the franchisor's marketing policies; that the gross disparity of bargaining power between the parties may lead to contracts of adhesion; and that termination may disrupt the reasonable expectations of the parties that the franchise relationship will continue. Id. at 875–77.

13. Various courts have held that the Act must be given a liberal construction consistent with the purpose of protecting retail franchisees. *See, Beachler v. Amoco Oil Co.*, 112 F.3d 902, 904 (7th Cir.1997); *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir.1982). The Petroleum Marketing Practices Act was intended to protect retail gas station franchisees from arbitrary termination or nonrenewal of their franchises with large oil companies, and to remedy disparity of bargaining power between the parties to gasoline franchise contracts. *DuFresne's Auto Service, Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir.1993). On the other hand, the Act gives the franchisors the right to terminate a franchise agreement in response to changing market conditions or consumer preferences, and to remedy the franchisees' violation of the franchise agreement.

14. In *Sun Refining & Marketing Co. v. Rago,* the Court of Appeals stated as follows:

> In keeping with the Act's acknowledgment of the inferior economic and bargaining position of the franchisee, the franchisor who wishes to terminate or not renew a franchise has the burden of proving compliance with all the statutory requirements of the PMPA. Additionally, the Act allows franchisees to obtain a preliminary injunction upon a lesser showing than is usually required. The effect of the PMPA thus is to create a presumption that any termination of a franchise is unlawful.

741 F.2d 670, 672 (3d Cir.1984).

15. In *Beachler v. Amoco Oil Co.*, 112 F.3d at 905, the Court of Appeals for the Seventh Circuit held that an injunction must issue if the franchisee shows:

> (a) the franchise has been terminated or the franchise has not been renewed;
>
> (b) there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> (c) the court determines on balance that the hardships imposed upon the franchisor by issuance of an injunction will be less than the hardship which will be imposed upon such franchisee if such relief is denied.

The court concluded that once a franchisee establishes a termination or nonrenewal, a plaintiff need prove only "a reasonable chance of success on the merits" concerning a violation of PMPA, and that the balance tips in favor of the franchisee. Id.

16. We find the evidence preponderates that the franchises of plaintiffs were terminated by the letter of BP Amoco dated February 26, 1999, and that there are sufficiently serious questions going to the merits to make such questions a fair ground for litigation. Further, we find the evidence preponderates that the hardship to plaintiffs from denying a preliminary injunction far outweigh the hardship, if any, to the defendants of record. Finally, we find that plaintiffs have established a reasonable chance of success on the merits, and that the weight of the evidence tips in favor of plaintiffs, at this juncture.

17. Defendants contend that the negotiated consent decree with the Federal Trade Commission is an "occurrence of an event which is relevant" under section 2802(b)(2)(c) of the PMPA, and therefore defendants' proposed termination of plaintiffs' franchise agreements is lawful. The consent decree or order was negotiated by defendants under threat of civil litigation

by the Federal Trade Commission following the merger of Amoco Corporation and British Petroleum Company. Plaintiffs were not parties to the abbreviated proceedings or negotiations with the FTC, and no court has reviewed or enforced the consent order.

18. We begin by noting that there is nothing in the PMPA that permits a franchisor to terminate a franchise agreement due to the threat of civil litigation by a third party, including a governmental agency. Such a rule would permit a franchisor to undermine a statute that was enacted by Congress, in part, to foster long term commitments between the oil companies and retail gas station service station operators.

19. Defendants negotiated the consent order with the FTC to save the cost of litigation to defendants, and the possibility of an adverse determination of the effects of the merger on the merits. There is nothing in section 2802 that permits a franchisor to terminate an agreement with a franchisee, who is complying with all terms and conditions of the franchise agreement, under these circumstances. Congress has carefully crafted a statute that seeks to address the disparity of bargaining power in the oil industry, and we decline to rewrite the Act and grant a defense to defendants based on the threat of litigation or the cost of defense. If defendants are unhappy with the statutory language, defendants should appeal to Congress for appropriate relief.

■ 20. Our conclusion is fortified by the teachings of the Court of Appeals that "the effect of the PMPA thus is to create a presumption that any termination of a franchise is unlawful." *Sun Refining & Marketing Co. v. Rago*, 741 F.2d at 672 (3d Cir.1984). While some terminations are specifically authorized by Congress, we hold that an event relevant did not occur under 15 U.S.C. § 2802(b)(2)(c) of the Act. Defendants' termination of the franchise agreements with plaintiffs is therefore unlawful.

■ 21. Assuming for the sake of completeness that an event relevant to the franchise relationship occurred when defendants negotiated the consent order, the evidence preponderates that termination of plaintiffs' retail franchises was not reasonable as required by 15 U.S.C. § 2802(b)(2)(c). Defendants agreed to sell all 29 Amoco gasoline service stations in the Pittsburgh Metropolitan Statistical Area, which are operated by independent retail dealers with rights under the PMPA, while retaining 40 presumably profitable company owned stations in this market in direct competition with plaintiffs. At a minimum, plaintiffs are entitled to discovery to determine the rate of return to defendants from the 40 company owned service stations in the Pittsburgh Metropolitan Statistical Area versus the rate of return to defendants from plaintiffs' stations. The results may be relevant to the basis for the planned divestiture of the stations operated by the independent retail dealers.

22. Following the consent order with the FTC, defendants negotiated a contract with Tosco Corporation for the sale of the 29 retail independent Amoco gasoline service stations in the Pittsburgh Metro Statistical Area for an undisclosed sum. As a result, plaintiffs have been notified that their leases have been canceled midstream and their contracts terminated. Plaintiffs have been instructed that they can either quit the premises or sign the leases proffered by Tosco. In addition, defendants plan to sell gasoline to the public in the Pittsburgh Metro Statistical Area through the 40 company owned gasoline service stations, and 35 retail independent dealers currently operating under the BP trademark. Defendants are reviewing the question whether to operate under the Amoco or BP trademark at the 75 stations in the future but one mark will likely be used at all the locations.

23. Plaintiffs have received no compensation for the termination of their leases,

and they have been denied any opportunity to purchase their stations prior to the sale to Tosco. In addition, the leases tendered by Tosco are an interesting study, under these circumstances. The Tosco leases essentially increase the monthly rent by 20% by replacing the Amoco 24 hour service allowance, with a $200 per month allowance *for one year*. For example, Anthony Mazzarini testified that he pays Amoco $12,000 and $8,000 per month for rent at the Cochran and Conner Road stations. Amoco provides a $2400 per month per station rent reduction or allowance because both stations remain open 24 hours a day. Most retail station operators are open 24 hours each day to meet competition and demand, satisfy fuel requirements by oil companies, and for security reasons. The Tosco allowance or payment of $200 per month is inadequate to pay the wages, lighting and other expenses associated with a 24 hour operation, according to the evidence of record.

24. The Tosco lease requires each of the 29 independent retail Amoco dealers in the Pittsburgh Metro Statistical Area to sell 80% of the average fuel sold by each Amoco dealer during the past two years. Tosco plans to rebrand the stations as "76" stations, and require plaintiffs to meet fuel allotments with an unknown brand in this market. There are no "76" retail service stations in the Pittsburgh Metropolitan Statistical Area, where loyalty is an important consideration to the people of this district. In addition, there are no retail "76" gasoline stations in the adjoining states and plaintiffs will not only be forced to abandon the Amoco credit card business, they will be forced to sell a product with no credit card use in this or the adjoining states. Anthony Mazzarini testified that over 50% of his customers use Amoco credit cards.

25. The Tosco lease also contains a provision that Tosco is entitled to receive 20% of the sale price if plaintiffs sell their businesses during the first four years after the leases are executed. Thereafter, the percentage is reduced on a decreasing formula. No transfer fee clause exists in the leases between plaintiffs and Amoco Oil Company.

26. Our review of the PMPA, and its underlying purposes, compels the conclusion that Congress never intended that the activities of defendants, under these circumstances, satisfy the reasonableness requirement of 15 U.S.C. § 2802(b)(2)(c). The evidence preponderates that defendants' conduct was arbitrary and capricious based upon the totality of the circumstances.

27. Defendants' reliance on *Russo v. Texaco, Inc.*, 630 F.Supp. 682 (E.D.N.Y. 1986) is misplaced. First, the Court of Appeals for the Second Circuit affirmed the judgment for reasons distinct from defendants' present position. The court held that Texaco's transfer of the Getty name and mark was the critical factor in determining that an event relevant had occurred, and not the sale of marketing assets, as here. *Russo v. Texaco, Inc.*, 808 F.2d 221, 226 (2d Cir.1986). Second, the Court of Appeals stated that it had not reached the question whether an event relevant had occurred which was reasonable, absent the trademark divestment by Texaco. 808 F.2d at 225. Third, defendants here are not required to transfer or divest any trademark. Fourth, the plaintiffs in *Russo* continued to operate under the same brand name where, as here, plaintiffs no longer may use the Amoco trademark. Plaintiffs are required to attempt to sell an unknown brand in the market or quit the business without the opportunity to buy the business, or a right of first refusal. And fifth, plaintiffs must continue to operate in the Pittsburgh Metropolitan Statistical Area in direct competition with defendants, assuming they desire to remain in business while, in *Russo*, Texaco withdrew from the relevant retail market. We find that the·opinion of the district court judge in *Russo* is distinguishable and unpersuasive.

28. The wrongful termination of a gasoline service station franchise constitutes irreparable harm. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir.1978). Moreover, the facts in this case establish, beyond all doubt, that these plaintiffs will suffer irreparable harm if their franchises are terminated as instructed by defendants.

29. The court will enter a preliminary injunction enjoining defendants from terminating plaintiffs' Amoco franchise agreements and related contracts with defendants, pursuant to 15 U.S.C. § 2805(b)(2). Further, defendants will be enjoined from terminating the Amoco franchise agreements with the 29 independent Amoco retail dealers in the Pittsburgh Metropolitan Statistical Area unless defendants present an affidavit within the discovery period establishing that the Amoco retail dealer desires to execute the Tosco lease and franchise agreement.

30. We will deny the motion of defendants for summary judgment without prejudice. The Clerk will issue a local rule 16 discovery order and the order will contain appropriate dates for motion practice. Finally, we will order plaintiffs to post a bond in the sum of $25,000 with the Clerk of Court within 48 hours.

A written order will follow.

## ORDER OF COURT

AND NOW, this 14th day of June 1999, in accordance with the findings of fact and conclusions of law of record,

IT IS ORDERED that defendants, their agents, servants and employees, shall be and hereby are enjoined preliminarily from terminating and/or not renewing the existing dealer leases, dealer loans, building incentive agreements and related dealer agreements with plaintiffs in the Pittsburgh, Pennsylvania, metropolitan statistical area (Allegheny, Beaver, Butler, Fayette, Washington and Westmoreland counties), and defendants shall maintain the franchise relationships until further order of court.

IT IS FURTHER ORDERED that defendants, their agents, servants and employees, shall be and hereby are enjoined preliminarily from terminating and/or not renewing the existing dealer leases, dealer loans, building incentive agreements and related dealer agreements with any of the other 29 Amoco branded independent service station dealers in the Pittsburgh, Pennsylvania, metropolitan statistical area (Allegheny, Beaver, Butler, Fayette, Washington and Westmoreland counties), and shall maintain the franchise relationships until further order of court, unless counsel present an affidavit to the court establishing that the independent retail dealer desires to execute a lease and franchise agreement with Tosco Corporation.

IT IS FURTHER ORDERED that the Clerk of Court shall issue a local rule 16 pretrial discovery order.

IT IS FINALLY ORDERED that plaintiffs shall file a bond for all plaintiffs in the total sum of $25,000 with the Clerk of Court within 48 hours.